CASES IN THE SUPREME COURT

GATLING *v.* NEWELL and Another.

Where representations, as to the superiority of a patented machine, and the demand for it, are confined to general statements, or expressions of opinion, upon facts equally within the knowledge, or open to the reasonable inquiry of either party, a right to rescind a contract of purchase of the patent could not arise, as a matter of course, because of the falsity of such representations.

Representations touching the existence of circumstances connected with, and the terms of, contracts at various places for the manufacture and sale of a patented machine, are such, that the law presumes the party making them (in this case the vendor of the patent) to be fully cognizant of their truth or falsity; and such representations having relation, in this case, to the income derived from the machine, and to private contracts to which the other contracting parties (the vendees of the patent) were strangers, they were not open, as a matter of right, to their inquiry pending negotiations for the purchase; but they were, nevertheless, such representations as they had a right to rely upon.

*Semble,* that a complaint may ask the rescission of a contract, *or,* if that cannot be had, damages for its violation.

The case between these parties, reported in 9 Ind. R. 572, modified in this: that it gives too great weight to the intrinsic value of the patent, in determining the validity of certain contracts for its manufacture and sale.

Where the vendor of territorial rights in a patented machine, made certain representations touching the present value of such rights and the present availability and utility of the machine; and in a complaint for rescission of the contract the vendees allege that the representations were false—it was *held* no defense to say that now—five years having elapsed—the rights and the machine are of the full value and utility then represented; and that, of course, evidence to sustain such a defense would be inadmissible.

The contracts sought to be rescinded, in this case, were made in 1850 and 1851, and had reference to territorial rights in *Ohio, Michigan,* and *Minnesota.* Evidence of the amount for which territorial rights had been sold in certain counties of *Illinois,* in 1856, and of the value of such rights in *Illinois* at that date, was rejected. *Held,* that there was no error; that the evidence should have been confined to a period of time nearer the execution of the contracts; that evidence upon these points could not properly embrace a period later than one year after the contracts were made.

The case between the same parties, reported in 7 Ind. R. 147, affirmed.

If a rehearing be prayed as to particular points, and granted as asked, it will be confined to those points.

And if the opposite party should desire a rehearing of any other points, he should petition for it.

APPEAL from the *Montgomery* Circuit Court.

HANNA, J.—This case was heretofore before this Court upon the pleadings (7 Ind. R. 147), and again after trial

(9 Ind. R. 572); and a rehearing having been petitioned for, by the appellees, and granted, as to certain points, we have again considered the case as to those points.

In regard to the points decided by the opinion in 9 Ind. R., against the rulings of the Circuit Court, and upon which a rehearing was granted, we have experienced much difficulty in coming to a conclusion.

It will be remembered that it was alleged that certain false representations were made, as to the superiority of the patent and drill, and the great demand for the same. Whilst such representations were confined to general statements, or expressions of opinion upon facts equally within the knowledge, or open to the reasonable inquiry of either party, we cannot see that a right of rescission could, as a matter of course, arise, because of the falsity of such statements.— *Cronk* v. *Cole*, 10 Ind. R. 485.

It is averred in the complaint, but denied in the answer, that certain false and fraudulent representations were made in regard to the existing circumstances connected with, and the terms of, contracts at *Chicago* and *Urbana*, for the manufacture and sale of the drill.

These facts were such as the law would presume the appellant to be fully cognizant of; and having relation to the income derived from that source, and to private contracts, in which the appellees were not parties, were not, in our opinion, open, as a matter of right, to their inquiry, pending the negotiation for a purchase, but were, nevertheless, such representations as they might rely upon.

It has been decided that a representation relating to the income or rent of an estate, does not fall within the rule, that the seller is not bound by representations respecting the value of property sold, because it is a matter that may be equally known to both parties, for the reason that the knowledge of it may be, and usually is, confined to one party, and the other can be presumed to ascertain it accurately only from him, or from those standing in a confidential relation to him. *Irving* v. *Thomas*, 18 Maine R. 424.

In *Dobel* v. *Stevens*, the defendant was in possession of a public house, under a lease, and represented to the plain-

tiff, who was negotiating to purchase the lease, that the receipts per month amounted to a certain sum, from various designated sources. Averment of the falsity of the representations, &c. The plaintiff proved that the representations were made as averred, and that they were false. The witness stated, on the cross-examination, that the books of the defendant were in the house, and might have been inspected by the plaintiff, and would have shown the truth as to certain of the representations, &c. It was held that if the vendor gave in a particular of his rents, and the vendee says he will trust him and inquire no further, then, if the particular be false, an action will lie. 2 Barn. and Cress. 623.

In the case at bar, there was evidence tending to sustain the averments of the falsity of the representations concerning the *Chicago* and *Urbana* contracts. The judge, sitting as a jury, must have found, before a decree could be entered in the form it was, annulling contracts following such representations, not only that they were false and fraudulent, but that they were, by the appellees, relied upon as true, and had induced them to make the contracts. If these were the only questions that properly arose in the case, we could not, under repeated decisions of this Court, disturb the finding. *Bronson* v. *Hickman*, 10 Ind. R. 3.— 2 Pars. on Cont. 268. Whether these were the only questions (other than those already passed upon by this Court) involved in the trial, depends upon whether the question of the value and utility of the patent right and drill, and representations in relation thereto, were necessary to be considered in arriving at a conclusion as to the validity of the contracts.

Much of the confusion in which the case appears to have been involved, and the conflict of opinions and arguments of counsel, so fervently advanced and zealously urged, were, doubtless, superinduced by the form of pleading adopted, looking first to a rescission of the contracts, or, if that could not be obtained, then asking damages. But this form of pleading has been, in effect, approved by this

Court, in an opinion by Judge Stuart, in *Colson* v. *Smith*, 9 Ind. R. 8.

Under the issues formed upon this complaint, we are still of the opinion that evidence of the value of the right and drill was important and relevant, if the question of damages was to be determined, and perhaps, also, upon the question of rescission, though possibly not to the extent indicated in 9 Ind. R. upon the latter point.

It appears to us that the gravamen of the charge of fraud arises out of the alleged false representations concerning the *Urbana* and *Chicago* contracts. It is alleged that the appellant represented that contracts had been entered into at those places for the manufacture and sale of a great number of the drills—the manufacturers agreeing to pay the appellant a fixed sum as premium for each one so sold; that considerable numbers had been sold under these contracts, and the demand was becoming so great that at least one manufacturer at *Urbana*, intended abandoning all other business, and enlarging his facilities for the construction of the drill. These representations presented to the mind a present and increasing income, arising from the patent, without finally disposing of the territorial rights therein, or incurring other expenses. We can very well perceive that instances might arise in which aged or infirm persons, or others about to leave the country for a time, or engage in some pursuit in life in which it was not desirable to be distracted by pecuniary cares, might be induced to invest money upon such representations relative to the income arising, and likely to arise, therefrom, without reference to the intrinsic value of the patent, or of the territorial rights conveyed. In such instances, we can scarcely believe that the intrinsic value should, in determining the validity of the contracts, have so great weight as the opinion in 9 Ind. R. appears to indicate.

If we are correct in this, that each case must, to a great extent, be determined by its own circumstances (Chit. on Cont. 681.—2 Pars. 267), then another question becomes more important than it might otherwise be considered, and that is, as to the period of time to which inquiry should

be directed to ascertain not only the value of the territorial right involved, but also the value of the patent itself. The invention might be useful and valuable, and at one period of time might not, for want of public appreciation, have any marketable or available price, and yet five years later, it might be estimated at a high rate by the public, because, in the meantime, information had been conveyed of such utility. If no information had been given, its estimated value might remain stationary. It will at once occur to the mind, that a man who should purchase a territorial right, when it was thus, in fact, of no available value in public estimation within that territory, without any expectation or intention of making expenditures of time or money, or otherwise using means to change that estimation, would have more cause of complaint if false representations should be made, of the character charged, than he who should purchase with the expectation, by great outlays and exertions, to fully develop its usefulness. If such a purchaser should be driven, by the circumstances of the case, from his original purpose, and compelled, to save his investment, to spend other larger sums of money, much time and attention, we do not think it would be a sufficient answer to a charge that representations, at the time of the contract, as to value and present available profits, were false—to say, "that may be so as to the profits of contracts, and may have been so, but as to value, it is now— five years having elapsed—of the full value then represented." If such an answer should be held good, and evidence of that character suffered to go to the jury, it would be permitting inventors to avail themselves of the capital, time, and energies of others, to an extent which we think is at war with the principles of law governing somewhat analogous cases, to which reference will hereinafter be made.

As to a territorial right in a particular invention, the value of that right—the general utility of the invention being conceded—would depend much upon the condition of the territory. A shingle machine, or an improvement in a saw-mill, might have much value in a timbered coun-

try, and none in a prairie. Consequently, such inventions would depreciate in value in the first-named territory when the timber was exhausted. Upon the location of a railroad through a timbered territory, an inventor of such improvements might well say, the right to that territory is of the value of 1,000 dollars, and will, perhaps, sell for that price. At the end of five years, after the timber in the given territory had been exhausted, through the use of the improved machinery, ought the purchaser of the right to be permitted to make proof that it was then of no value in that territory, as an answer to a demand for the purchase-money for such right?

We are not now combating the general propositions advanced in 9 Ind. R., but desire to carefully inquire into the correctness of the application of the principles advanced, to the case at bar.

A patent for a limited time, say seven years, for an improved mode of manufacturing wine from grapes, might be of much value in a grape-growing country; and yet, within that time, it might not be of any great value in another region of country equally well adapted to the cultivation of the grape, for the reason that, in the last-named place, attention might not have been turned to such pursuits. Nevertheless, ultimately it would, upon the development of that branch of industry, become equally valuable there. But that might be after the expiration of the patent right.

It is difficult to distinguish the difference, in some respects, between the rights, and the rules of law applicable thereto, of a lessee of real estate for a given period of time; and the rights, &c., of the assignee of a patentee in designated territory, for the same time. In the one case, the landlord assumes to grant certain exclusive rights for the time agreed upon. So, in the other instance, the patentee assumes to grant certain exclusive rights, for, say the same length of time. If the landlord fails to comply with his contract, adjudicated cases have fixed the point of time to which attention should be called, and evidence directed,

in an attempt to ascertain the damages to which the tenant would be entitled.

In *Trull* v. *Granger*, 4 Seld. 115, a contract was made in *September*, 1849, by which certain premises were leased for a term of five years, commencing the next *May*, at which time possession was to be delivered, at an annual rent of 500 dollars. In *May*, when the agreement was to have been performed, the value of the premises had risen to the sum of 600 dollars per annum. The landlord failed to deliver possession. In a suit by the lessee against the lessor for such breach, the plaintiff had a verdict for 415 dollars, 99 cents. The Court of Appeals say: "The rule of damages adopted in this case was correct. * * The difference between the yearly value of the premises and the rent, was the true measure of damages." In that case, it will be noticed that the yearly value of the premises had advanced 100 dollars, from *September* until *May* following, assuming the price agreed upon to have been the reasonable value at, the time of the contract. At the same rate of increase for every eight months, until the expiration of the five years, the sum would be much more than the amount of the verdict. There is no indication that any attempt was made to claim the increase, if there was any, of the annual value of the premises after the breach of the contract, although some time had elapsed before trial. The language of the Court would preclude the idea that such a proposition, if made, could have been entertained. The judgment was for the difference between the price agreed upon and the yearly value at the time of the breach of the contract, deducting interest.

Under the acts of congress of 1830 and 1834, preëmption rights were granted to certain settlers, to be located any place in the land district, &c., and were called *floats*. In an action on an agreement by which two eighty-acre *floats* were to be transferred at a fixed price; this Court held that the measure of damages was the value of the article at the time of the breach, and not "the advance or advantage to be derived from land reasonably well located

as a *float* of preëmption in the land district," or damages
for the fancied goodness of the bargain which was lost.
*Ward* v. *Burr*, 5 Blackf. 116.

It is also a well known principle of law, that the measure of damages for the breach of an executory contract for the delivery of a specific article of personal property, at a fixed time and place, is regulated by the difference between the contract price and the market value of such articles, at such time and place. *Hopkins* v. *Lee*, 6 Wheat. 109, 118.—*Dana* v. *Fiedler*, 2 Kern. 41.—*McKnight* v. *Dunlop*, 1 Seld. 537.—*Clark* v. *Moore*, 3 Mich. R. 55.—*Barnard* v. *Conger*, 6 McLean, 497.—*Rawdon* v. *Barton*, 4 Texas R. 289.—*Smith* v. *Dunlop*, 12 Ill. R. 184.—*Cannon* v. *Holson*, 2 Iowa R. 101.—*Van Vleet* v. *Adair*, 1 Blackf. 346.—*Id.* 296.—4 *id.* 260.—*Lucas* v. *Heaton*, 1 Ind. R. 264.—10 *id.* 20.—2 Greenl. Ev. 272.

So in actions for the breach of special agreements or contracts, for the construction of public works, it has been held that, although profits upon such contracts may be recovered to a certain limit, yet such profits must be calculated and based upon the difference between the contract price, and the price at which the performance of the work could be procured, at the time of the breach. *The Philadelphia, &c.,* v. *Howard*, 13 How. 307.—*Story* v. *The New York, &c.,* 2 Seld. 85.—*Seaton* v. *The Second, &c.,* 3 La. R. 45.—*Cunningham* v. *Dorsey*, 6 Cal. R. 19.—*Masterton* v. *The Mayor, &c.,* 7 Hill. 62. In the latter case, the plaintiffs, at the time of the breach of the contract, had near five years to complete it; and yet the Court instructed the jury that, " In fixing the damages to be allowed the plaintiffs, the jury are to take things as they were at the time the work was suspended, and not allow for any increased benefits they would have received from the subsequent fall of wages, or subsequent circumstances." But even to that extent, the correctness of the measure of damages adopted, in this class of cases, appears to be incidentally doubted by our own Court. *Jones* v. *VanPatten*, 3 Ind. R. 107. In that case it is also decided, in effect, that in actions for breach of ordinary contracts between individuals, the mea-

sure of damages is not the price stipulated to be paid on full performance, but the actual injury sustained in consequence of the defendant's default; and that the sum which ought to be recovered is what would make the plaintiff reasonably whole at the time of the breach, all the circumstances of the case being considered.

These cases are cited as being, in our opinion, based upon principles somewhat analogous to those that should govern in arriving at a conclusion as to the correctness of the rulings now under consideration in the case at bar.

Without stopping to critically examine and nicely weigh the facts and circumstances of this case, to ascertain whether the question of the value of the patent and of the territorial rights, was one necessarily to be considered by the Court, to the extent indicated in 9 Ind. R., in determining upon the prayer for a rescission of the contracts, we are of opinion that, even if evidence should have been heard upon that question, that offered and rejected was not admissible. The contracts sought to be rescinded were entered into in *November*, 1850, and *February*, 1851, and had reference to territorial rights in *Ohio*, *Michigan*, and *Minnesota*. The evidence offered and rejected, was as to the amount for which territorial rights had been sold in certain counties in *Illinois* in 1856, and also as to the value of the right in *Illinois* at the latter date. Such evidence should have been confined to a period of time nearer the execution of the contracts. The Circuit Court permitted proof upon those points, up to, and for a year after the time the contracts were made. We think this was as much as the appellant could ask—as extended a margin as he could rightfully claim to make proof in; and much more so than has been, by other Courts, permitted in the several classes of cases above cited.

PERKINS, J.—I take no part in the decision of this cause upon the present (its third) examination here; and I should not have said a word at this time in reference to it, did not some remarks of counsel, in their argument upon its present submission, render it imperative, considering the part

May Term,
1859.

GATLING
v.
NEWELL.

heretofore taken by me in the case, and the subsequent change in the bench, that I should briefly review its past history.

The remarks of counsel spoken of relate to—

1. The decision reported in 7 Ind. R. 147.

2. The construction of the 4th rule of this Court.

It is said the decision in 7 Ind. R. was out of time and wrong in law.

The case was in chancery, instituted to obtain the rescission of a contract and damages. The bill was demurred to, and the demurrer sustained so far as the application for rescission was concerned. Other rulings, also, were made. An appeal was taken from those rulings to this Court. Both parties assigned errors, filed briefs, and asked a decision of this Court upon those rulings. They did not object to the jurisdiction. The Court considered the case, and decided, besides other questions of practice, these two material points :

1. That the appeal was prematurely brought, as the final judgment in the cause had not been rendered.

2. That the bill, upon its face, made a case for rescission.

The Court had jurisdiction of the cause. The appeal came to it in the usual form from the Court below; and. no motion was made to dismiss it. It was submitted by both parties. The Court had jurisdiction, necessarily, to entertain it so far as to determine the question whether the judgment below, appealed from, was such a judgment, as could, at the then stage of the case, be reviewed on appeal; and, being legally in possession of the case for that purpose, it was, it strikes me, a less departure from propriety in the Court, to express, at the solicitation of both parties, an opinion upon a further point argued, than it is in one of those parties now to assail the Court for having complied with the request.

And was that decision wrong in law?

The bill charged that the contract sought to be rescinded was obtained by fraudulent representations which the plaintiffs believed to be true, relied upon as so, and that

they were induced to enter into the contract by them. They were representations upon which the purchasers had a right to rely. Were any of those representations of such a character as, being fraudulent, vitiated the contract? Was any one of them such? Did any one of them go to a fact constituting a material part of the consideration of the contract? One of the representations charged in the bill was that he, *Gatling*, had a contract with *Minturn, Allen & Co.*, in *Champaign* county, *Ohio*, a county included in the sale of the patent right in question to *Newell* and *Beach*, together with the benefit of said contract, by which contract said *Minturn, Allen & Co.* were to manufacture drills for the supply of that section of country, and were to pay to *Gatling*, and thenceforth to his assignees, *Newell* and *Beach*, 10 dollars for each drill sold; that they had already paid 300 dollars, pursuant to the contract, for drills sold; that they were unable to supply the demand, so great was it, for the drill, and were about to enlarge their establishment, &c., to enable them to do it. Now, were not these facts going to a material part of the consideration? Here was the sale, by representation, to ·the purchasers of the patent, of a valuable income from the very day of purchase. Yet, the bill averred that the representation was utterly false. I have no hesitation in now saying that the decision of this Court upon that bill was right. Whether such representations were made, whether they were relied on, or had been waived, &c., were questions to come up afterwards upon a trial.

Next as to the construction of the 4th rule of the Supreme Court. That rule reads:

"Rehearings must be applied for during the term in which the decision is made, and by petition in writing, setting forth the causes for which the judgment or decree is supposed to be erroneous. The Court will consider the petition without argument, and direct the rehearing, if granted, to one or more points, as the case may·require."

In this case, the petition asked for a rehearing upon two points, setting forth causes as to those points, and no more. The Court granted the rehearing as to those points, and

what more could it, consistently with the rule, upon such
a petition, have done? Yet, in thus acting, the Court is
charged with adopting a "new reading" of this rule. But
the Court might ask the counsel to cite a case where,
upon a petition for a rehearing upon given points, any
other reading was adopted. No such citation has been
furnished.

The Court decided to grant the rehearing in accordance
with the prayer of the petition. This was proper; but
that act did not determine the question as to the legal
effect of the grant. And it seems to be the rule in chan-
cery practice, in which alone rehearings are granted in
*England*, that a rehearing as to particular points, granted
upon the application of one party, opens up the whole
case for argument to the opposite party, so far as anything
in it might influence action upon the points on which a
rehearing is asked. *Consequa* v. *Fanning*, 3 Johns. Ch.
394.—*Dale* v. *Roosevelt*, 6 *id.* 255.—3 Dan. Ch. Pr. (Perk.
ed.) 1632. To this rule, counsel have conformed in their
argument of this cause. By the *English* practice, new
trials are granted at law, and rearguments in Courts of
error; but we have met with no case where a rehearing
was granted after final decision in a Court of error and
appeals at law. They are common in chancery, and are
analogous to new trials at law. For good reasons, with-
out doubt, they have been incorporated into the practice
of the Supreme Court in this state, as applicable to cases
both at law and in chancery. But the practice in granting
them, in this Court, is governed by our statute, and the
rule of the Court. By them, either party may petition for
such rehearing at any time within sixty days from the first
decision. The rehearing may be applied for as to the
whole case, or particular points. The cause remains un-
certified for the period named. Hence, both parties must
take notice of petitions; and if the filing of a petition by
one should render it expedient for a petition, also, by the
other, he must file it, if he wishes alleged errors as against
himself considered. Such we consider the better practice
in the Supreme Court under the rule.

VOL. XII.—9

*Per Curiam.*—The judgment is affirmed with 1 per cent. damages and costs.

*W. Z. Stuart* and *J. A. Liston*, for the appellant (1).

*S. C. Willson, J. E. McDonald, S. Judah*, and *H. O'Neal*, for the appellees (2).

(1) Mr. *Stuart* made the following argument:

The points to which the present submission is confined are those arising on the fourth and fifth bills of exceptions taken during the progress of the trial below.

The other points raised in the cause, and determined when heretofore submitted, the Court has decided to be closed. That decision, if it was rightly apprehended, is, that a rehearing is granted only to the party petitioning for it, and then only as to the points specifically made in the petition, or as to some one or more of them; and that the word "case," as used in the fourth rule, means the case made in the petition for a rehearing, not the "case" as originally presented on the first submission. All other points made and determined on the original submission, to which no petition for a rehearing was addressed in proper time by either party, the Court regard as definitely settled.

The application of this novel construction of the rule has operated with extreme hardship upon the appellant. It is believed that this has not hitherto been the practice of the Court. It is believed that in the few instances in which a rehearing has been granted, it operated like a new trial to open the whole case.

Still we are not understood as complaining of the rule. As to all such rules of practice it is not very material what they are, so that their application be uniform. All that the profession can ask is, that the practice which has grown up for forty years under the rules shall be adhered to as a proper exposition; and that all new readings of old rules, or any modifications of them, should be promulgated before they are applied.

The effect of the decision alluded to on *Gatling's* case is, that because he did not petition for a rehearing on the points decided against him within sixty days, he is therefore concluded as to those points, though a rehearing was granted to the opposite party.

We may be permitted respectfully to suggest, that for a party in whose favor a case had been reversed to petition for a rehearing, would look a little awkward. Would not such a petition seem like an attempt to trifle with the time and patience of the Court? This Court has never listened with much indulgence to a petition for a rehearing in any case—not even when preferred by the party against whom the case was decided. There must be a remarkable change in the judicial mind, if this Court would look complacently on a petition for a rehearing from the party in whose favor the case had been reversed. Such petitions are always felt to be an imputation on the care, diligence, and learning of the Court. As such they were regarded in *The State v. The Vincennes University*, 5 Ind. R. 77; *Greencastle Township v. Black, id.* 557, and many others which might be cited. In many of these cases, accordingly, the petitioner, though he was the party against whom the decision was made, was yet handled without gloves for his presumption.

But if such is the rule, so be it. The construction given to-day against us, may serve our turn to-morrow.

It is presumed that if there were other points made on the former submissions, but not passed upon by the Court in either of the decisions reported in 7 Ind. R. 147, or 9 Ind. R. 572, these points thus undetermined must also remain open questions under this submission.

The burden of the fourth and fifth bills of exceptions is, the error of the Court below in excluding certain evidence. To understand the application and force of the excluded evidence, it will be necessary to keep in mind what was to be tried. To this end let us inquire briefly:

1. What were the issues joined between the parties?

2. What did the trial by the Court embrace? Was it one or all these issues?

3. Was the rejected evidence pertinent and relevant to any one or more of these issues?

If the evidence rejected was pertinent and relevant to any one of these issues, then we take it to be clear that the Court below erred in rejecting it; and that the former decision of this Court, reported in 9 Ind. R. 572, reversing the case for that cause, should be adhered to.

It is believed that the answers to those inquiries will substantially embrace every matter in controversy, and every collateral consideration properly connected with the case under this submission, as limited by the Court.

Before proceeding to the examination of the inquiries suggested, a few things may be pertinently premised.

1. The decision in 9 Ind. R. reversing this case, was the unanimous opinion of the Court, as then constituted, as to the point on which it was reversed. Were the Court now constituted as it then was, it would not be necessary, nor perhaps proper, to allude to the case in detail, either as to law or fact. In such case, the discussion might properly be limited to the specified bills of exceptions.

As the Court is now constituted, it is different. The new judges cannot be expected to fully appreciate these isolated points, without carefully considering the whole case, and the relations of the open questions to those that are closed. In other words, in granting the rehearing, the new judges have assumed the task of making themselves fully masters of the allegations and proofs. This, it is not doubted, they will do.

2. It is further suggested that in trials by the Court, a wider range is usually indulged in the admission of evidence than in trials by jury. And the reason is obvious. After the case is all heard, the single mind of the Court, trained to such inquiries, can more easily separate the relevant from the irrelevant evidence, than can the varied and clashing views of twelve jurymen, unused to the application of legal principles. Hence, as to the admission of evidence to a Court or to a jury, there is an obvious and just distinction. The one can separate the wheat from the chaff; the other cannot. In trials by the Court, it is, therefore, quite immaterial what evidence is adduced; and it is usually so treated in practice. The Court briefly says, we will hear the evidence and determine its relevancy hereafter.

But the same considerations do not apply to the exclusion of evidence. If evidence is excluded, it has, of course, no effect on the mind of the jury, or of the Court sitting as a jury. The theory is, that the one mind or the twelve minds pass only upon what is judicially submitted to them as evidence. The

excluded evidence is entirely lost sight of. However pertinent or important it may, in fact, be, or however improperly or unjustly excluded, it still has no influence whatever on the decision.

Hence, as to material evidence which is excluded, it can make no difference whether the Court excludes it from the jury, or from itself sitting as a jury. It is equally error—equally prejudicial to the party against whom the exclusion is made.

3. In the third place, it may be further suggested, that this case has had a singular judicial history.

When it first came to this Court, it may be said to have come in at the back door. It is reported in 7 Ind. R. 147. It will be seen that, according to the rules and established practice of the Court, it was not entitled to any consideration. It was not judicially before the Supreme Court. There was·no final judgment from which an appeal would lie. Repeatedly—nay, it may be better stated invariably—had cases been dismissed which were thus prematurely brought to this Court. The judgment appealed from was a mere judgment on demurrer as to the sufficiency of a part of the complaint. It did not decide the whole case. The complaint was held insufficient for a rescission, but sufficient for the recovery of damages. On this last branch of the case, there was no issue, trial, or judgment whatever. Hence, there was no final judgment; and from such only an appeal lies to this Court. 2 R. S. p. 158. The jurisdiction of the Supreme Court is wholly statutory; and where jurisdiction is not expressly given, it is not possessed. The principle has been repeatedly recognized in this Court, in the following among other cases: *Chandler* v. *Swisher,* 2 Ind. R. 222; *Bradley* v. *Bearss,* 4 *id.* 186; *Fobes* v. *Martin,* 5 *id.* 452; *Branham* v. *The Fort Wayne, &c., Railroad Co.,* 7 *id.* 524; *Shroyer* v. *Lawrence,* 9 *id.* 322; *French* v. *Lighty, id.* 475.

Even in this very case, in 7 Ind. R. *supra,* the Court say: "The cause has not been brought to a final hearing on the merits, but only to the point where the Court below ruled that the plaintiff could not have a rescission." And again :—"The cause is not at present properly before us, and ought not to be here."

Yet it was, with great reluctance on the part of the Court, considered and sent back reversed. The argument tenaciously urged for that course was, that the appellees only wanted a fair trial on the merits.

This reversal was clearly a gross departure from both principle and practice, to the prejudice of the appellant.

Judge BRYANT, trammelled by that decision of the Supreme Court, rescinded the contract; and on appeal by *Gatling,* this Court say, "Judge BRYANT's decision on the evidence is conclusive. We will not disturb the finding on the facts."

But the lower Court excluded certain evidence which should have been admitted. For that error the case is reversed. The appellees petition for and obtain a rehearing. The appellant objects, but fails to file a formal petition for a rehearing in sixty days. This, the Court holds, concludes the appellant on the points decided against him—thus holding the latter to the strictest rules of the legal game.

We do not complain of this. Yet, as the appellees had brought their case here, in the first instance, "out of time and out of tune," without a shadow of jurisdiction in this Court, and had an opinion in their favor, it would seem but

fair and equitable, and, as some members of the Court understood it at the time, that they should have been put upon terms—that they should take their rehearing as to the whole case. That their good luck was accidental, as it undoubtedly was, renders it no less prejudicial and ruinous to the appellant. For the point on which the case was reversed against the appellees was by no means the strongest point made by the appellant against the judgment below. There are other points which, if an unbroken chain of authority means anything, or is anything, ought to have settled the appellees' case against them to all eternity. To some of these points, it will be our duty to presently call the attention of the Court—stating the purpose for doing so at the outset.

Perhaps the point on rehearing may be plausibly decided either way. And, as *Burns* says of the pulpit, perhaps even that error might be nailed with a legal text seeming to support it. In that event, the appellant would stand, at the end of the game, beaten on one of the plainest cases, both as to law, equity, and fact, which ever came before a Court.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

4. In the fourth place, it may be further suggested that this case has a singular history as developed in the record. Almost all that the appellant could ask is, that the judges who granted the rehearing should carefully read the record. That record, on the very first blush, discloses a history conclusive against the appellees.

The parties to the contract rank high in the community in position, attainments, and varied experience. It is not easy to conceive how such parties could possibly practice any species of fraud upon each other, about so simple a machine as a wheat-drill. The appellees would scarcely concede their inferiority to the appellant in point of intellect and general information. Yet their whole complaint is an elaborate asseveration of the appellant's superiority over them, and their own ignorance, alike of the simplest machinery, and of the general topography of the adjoining states.

It is quite easy to see how an unsophisticated farmer, fixed like a plant to his farm, might be circumvented. It is quite possible to conceive how a plausible man of the world might play on his ignorance, and fan his cupidity, with improvident and even ruinous contracts. Such things are not uncommon. But how the appellant could prevail over men of the age, experience, and shrewdness of the appellees, about the qualities of a machine so simple in its construction, and so open to the observation of the most ordinary capacity, is something quite beyond comprehension. The very intimation of such a thing seems more like a hoax than a reality.

What! Did not the appellees see the machine they were buying? and could they not judge of its adaptation to the culture of wheat in this or that locality, as well as the appellant? It would be amusing to hear these gentlemen explain by what magic the appellant persuaded and convinced them fraudulently of a fixed fact, as well known to them, or which ought to have been as well known to them, as to him—viz., that *Michigan* was a wheat-growing country. &ast; &ast; &ast; &ast; &ast;

Had these gentlemen sued the appellant for seducing two eminent members of the bar from the practice of the law into the devious paths of patent-right peddling, for which they had no capacity, their right to recover could be scarcely controverted.

If the first blush of the thing is thus preposterous, the details are equally so.

It is not proposed to enter on the evidence, but only to exhibit a few dates, whose "mute dumb mouths" speak volumes of the time, opportunity, knowledge, and means of knowledge, of what they were buying, possessed by the appellees. We respectfully invite the particular attention of the Court to these dates.

In *September*, 1850, *Beach* bought four counties in *Ohio*.

*November* 20, 1850.—*Newell* and *Beach* (*Peaslee* a silent partner) purchased the right to *Michigan* and *Minnesota*.

*November* 20, 1850.—The former deed to *Beach* was canceled, and the four counties he had purchased on individual account were embraced in the same deed with *Michigan* and *Minnesota*.

*December*, 1850.—*Beach* and *Peaslee* visited these four counties in *Ohio*, and that state generally.

*December*, 1850.—They procured in *Ohio* a large number of certificates from the farmers who had used the drill, in favor of its utility and value.

*December*, 1850.—*Beach* and *Peaslee* had a power of attorney from *Gatling* to sell territory in *Ohio*.

*December*, 1850.—*Peaslee*, with the knowledge of *Beach*, sold *Preble* county for 150 dollars.

*January*, 1851.—After an absence of four weeks, they returned to *Indiana*.

*February* 5, 1851.—*Beach* and *Newell* made the second purchase of twenty-eight counties in *Ohio* for 3,000 dollars.

*April* 17, 1851.—They went to *Urbana, Ohio*, examined the *Minturn, Allen & Co.* contract for themselves, and indorsed thereon as follows, viz.: "Having purchased the territory for which the within contract was made, we do hereby agree to conform to its terms. *Newell* and *Beach*."

*March* 5, 1851.—*Newell* and *Beach* wrote to their agent, *Nelson*, saying that *Gatling* had shown them a copy of the *Minturn, Allen & Co.* contract, by which *Minturn, Allen & Co.* were to pay 10 per cent. premium on each drill.

In *March*, 1851, and also in *April*, 1851, *Newell* and *Beach* knew precisely the terms of the *Minturn, Allen & Co.* contract.

*May*, 1851.—*Beach* went to *Michigan* on the business of the drill, and was absent some three weeks. This is all they ever did.

*July* 15, 1851.—*Gatling* left *Indiana*.

During the years 1851, 1852, and till the spring of 1853, *Gatling* had known agents at *Lebanon* and *Indianapolis*.

*March* 12, 1853.—*Beach* proposed to negotiate, and wrote to *Gatling* a proposition to take back territory on the notes then due; but not a word of fraud or rescission.

Two years and a half intervene between the first purchase by *Beach*, in *September*, 1850, and his last proposition in *March*, 1853; and during all that time, and up to the latter date, and in his letter of the latter date, he makes no pretense, even, that he had been defrauded, or that he expected to seek his remedy by rescission.

So much for the language of dates, as illustrative of the merits of the case. Such means of knowing—time to reflect, and be informed—and such acts of confirmation—would have justly sealed the fate of a case having merit in it— much more such a case as this.

Add to all this these significant facts:

1. They never attempted to introduce the drill in *Minnesota*.

2. They never manufactured a single drill, or used the rise-and-fall tooth drill.

3. They incumbered the territory in various ways, so that it was impossible to put themselves or *Gatling* in a position to rescind.

There are also some additional dates of great importance.

*August*, 1853.—This suit was commenced. The deed said to be tendered before suit, purports to be dated *May 3*, 1853.

*August* 31, 1853.—The deed above mentioned was tendered to *Gatling*.

*September* 13, 1856, is the date of the second deed tendered in Court.

*September* 17, 1856, the date of the tender.

The deed of *May*, 1853, tendered *August*, 1853, is so obviously defective, conveying but a part of the territory, that they themselves abandoned it by the second deed of *September*, 1856. It is accordingly treated as though no deed had been tendered before suit brought.

Such is the foundation laid by the appellees for a rescission.

In addition, no one of the alleged acts of fraud is sustained by the evidence. On the contrary, on each point, the evidence makes a strong case against the immaterial and frivolous allegations of the complaint. In brief, with all respect in the world, alike for Judge BRYANT and for this Court, there is no case made for the plaintiffs on paper—none in evidence. Even if the complaint were above suspicion, there is an utter, total failure of proof.

In the suggestions above made, and such suggestions as may be further made, there is no purpose of pressing a reconsideration of any point which this Court has, under its rules, held to be closed. Any such object is expressly disclaimed. The sole purpose of these preliminary suggestions is, to show the Court, as now constituted, that this is not one of those evenly balanced cases which should lead judges to throw doubts, if they had any, in favor of the appellees. The equity of the case requires, as we expect to show further, that if there are any doubts, they should be thrown in favor of the appellant. Every judge has felt that in some cases the equity and justice is so strong one way, that if the merits could be reached, it should be done. But on the part of the appellees, this is not one of those cases. And the purpose of these preliminary suggestions, made and to be made, is to call the attention of the Court to the case, as it appears in the record. We respectfully submit that, on such examination, it will be found that the appellees have not a shadow of equity in their case. The great fact which we respectfully assert, and which stands out all over the complaint, and all over the evidence is, that there is nothing—never was anything—and never can be anything—entitling the appellees to a rescission. It would be a sad reproach to the Courts, if such a case as the complaint and the evidence disclose should ultimately prevail.

Accordingly, then, not with a view to reopen any point which the Court deems closed, as to this case, but solely for the purpose above intimated, the attention of the Court is respectfully called to the following further suggestions:

To justify the assertion, that there is no case in the complaint, let a few well settled rules suffice.

In relation to the joinder of claims, the established doctrine under the old practice has been that you cannot join a claim for damages for the breach of a contract, with a claim for a rescission of the same contract.

It is not proposed to examine this question much in detail, or with special reference to the new practice. The legislature may repeal and remodel, and use new language; the Courts must follow *pari passu* with their rules of construction, and give the legal purport of new enactments. But there are some things which the legislature, even, cannot do. They cannot enact that a thing exists, and does not exist, at the same time. They cannot enact that a party may reap the benefit of a contract, and also rescind it, in the same action. That difficulty lies behind statutes. It exists in the very nature of things; in the choice of remedies, to sue on a contract, or sue to rescind it. This difficulty cannot be cured by statute. Rescission and damages cannot both arise to the same party on the same contract. They are incompatible. A demand of the one waives the other. An action to rescind waives damages for the breach; so an action for damages for the breach affirms the contract, and demolishes the right to seek the remedy by rescission. Thus, under the old practice, the analogy of alternate remedy was familiar. If *A.* sued *B.* for the value of a horse which the latter had tortiously taken, the very form of the action necessarily waived the tort. It is not presumed, that, under the new practice, *A.* could, in the same paragraph, claim the value of the horse, and also a return of the animal itself besides. This would not be comprehended in the specific prayer for the value of the horse, and "other proper relief." *A.* might elect his remedy—he might go for the value of the horse, or for the horse itself. He could not have both.

The object of a rescission is to place the parties in *statu quo;* to restore them to the position in which the contract found them. It operates as a comprehensive replevin to restore to each his own property. This results from annulling the contract, and placing the parties as though it had never been made.

But it is very different when damages are the object of the suit. The very basis of the action is, that the contract still subsists and is affirmed. Each retains whatever he may have received from the other. The one alleges that, by the fraud of the other, he has not enjoyed his contract as he should have done. Therefore he sues for damages. The fraudulent party is mulcted to compensate for the injury which his frauds had occasioned; and the contract in other respects stands affirmed.

This is the first case in modern times where both remedies have been sought, and so far as the decision of this Court in 7 Ind. R. 147 is concerned, has unfortunately been enforced. That decision may not fully disclose all the facts; but such are the facts. It was hoped that the Court would have felt at liberty to review that decision in the very case in which it was rendered. For reviewed and overruled it must be, sooner or later. It is simply preposterous to talk of annulling a contract and claiming rights under it, or damages for its breach, at the same time and in the same action. *Newell* and *Beach* should have elected to pursue the one remedy or the other. They could not avail themselves of both remedies. If they elected to rescind, they waived whatever damages they might have sustained by the alleged breach or fraud of *Gatling.* If they went for the damages, they adopted the contract. This is the general, the invariable, doctrine of the books, in relation to executed contracts like that at bar.

In confirmation of this position, I now respectfully beg the attention of the

Court to the very language of some of them—the very essence of elaborate opinions reviewing the ancient and modern authorities on this point.

Thus, in *Lloyd* v. *Brewster*, 4 Paige, 537 : A party to an agreement cannot affirm the contract in part, and rescind in part, so as to maintain assumpsit for the part he claims to rescind. See, also, *Lyon* v. *Bertram*, 20 How. 149.

The rescission of a contract necessarily destroys the party's remedy upon it, or even upon a guaranty for its performance. *Smethurst* v. *Woolston*, 5 Watts and Serg. 106.

If a party would rescind, the rescission must be entire; he cannot consider the contract void, for the purpose of reclaiming his property, and at the same time consider it valid for the recovery of damages upon it. *Junkins* v. *Simpson*, 14 Maine R. 304.

In the leading case in the *English* Courts, *Hunt* v. *Silk*, 5 East, 449, the defendant, in consideration of £10, agreed to let a house to the plaintiff, repair it, and execute a lease therefor in ten days. In the meantime, the plaintiff was to have immediate possession, pay the rent, and execute a counterpart to the lease. The plaintiff paid the £10, and took possession; but the defendant failed to execute the lease, or make the repairs, within ten days. Instead of abandoning the premises, and treating the contract as rescinded, at the end of the ten days, the plaintiff still remained in possession beyond that time. The question was, whether the plaintiff could, by leaving the house for the defendant's default, rescind the contract and recover the £10 in an action for money had and received. The Court held the plaintiff too late to rescind; that his remedy was on the contract for its breach, and ordered a nonsuit. On a rule, &c., Lord ELLENBOROUGH held, delivering the opinion in colloquial style— "If the defendant fail to repair at the end of the ten days, and you intend to rescind, *you* must make your stand there, and not proceed to a further continuance in the house under the agreement. You have the benefit of the ten days' occupation, and after that time there is no rescinding the contract." With the further observation, that the party could not both rescind and enjoy the same contract, the rule was refused. This case, in 5 East, is quoted so often in our own and other reports, that it was deemed proper to give its substance. It was delivered in 1804, and has been cited and followed as a standard authority on that branch of the law ever since.

The case which repeated citation has made a leading one in the *American* Courts, is *Masson* v. *Bovet*, 1 Denio, 69. The facts in that case were, in substance, that *Bovet* was a *Swiss*—spoke *French*, understood *English* imperfectly, and had been in the country only a few months. Through the misrepresentations of *Masson*, he had been induced to purchase one hundred acres of land at sheriff's sale. *Masson*, knowing that there were prior liens to more than its value, represented to *Bovet* that it was clear of all incumbrances, except his (*Masson's*) judgment, on which it was to be sold; repeatedly urged him to buy; that it was a great bargain, &c.; and on the day of sale, notified him of the time and place. *Bovet*, immediately on discovering the fraud, offered to restore, &c., brought suit to rescind, and on the trial had judgment. After alluding to the facts and the authorities, the Court lays down the following rule, so often and so extensively quoted and followed by other Courts since, viz.: If the party defrauded would disaffirm the contract, he must do so at the earliest practicable moment after the cheat is discovered. That is the time to make his election; and it must be done promptly and unreservedly. He must not

hesitate; nor can he be allowed to deal with the subject-matter of the contract, and afterwards rescind it. The election is with him. He may affirm or disaffirm the contract; but he cannot do both. If he concludes to abide by it, as upon the whole advantageous, he shall not afterwards be permitted to question its validity.

In both these cases, the plaintiffs sought only to restore what they had received, recover what they had parted with, and to that end, to rescind. The one delayed, enjoyed the contract partially, and rescission was refused. The other promptly offered to restore, demanded what he had paid, and rescission was decreed accordingly.

In *Junkins* v. *Simpson*, 14 Maine R. 364, the action was replevin for a yoke of oxen. The parties had exchanged oxen—*Junkins* giving 10 dollars to boot. The oxen exchanged by *Junkins* had been previously mortgaged for 14 dollars, which the mortgagee sought to enforce. On discovering this, *Simpson* drove back the mortgaged oxen, and reclaimed those he had owned before the exchange. *Junkins* brought replevin for the yoke thus reclaimed by *Simpson*. Concurrently with reclaiming the oxen, *Simpson* did not return nor tender the 10 dollars boot. In the Court below *Junkins* had judgment. On this state of facts, the Court held—

1. That *Simpson* had a right to regard the exchange of the mortgaged oxen as fraudulent; but that the contract was not void—only voidable at the election of the party defrauded.

2. The party having such election must rescind the contract wholly, or in no part; that he could not keep the boot, and yet reclaim his own oxen too; that if he intended to rescind, he should have returned the 10 dollars, as well as the oxen received in exchange.

In *Rowley* v. *Bigelow*, 12 Pick. 307, SHAW, C. J., says: "It depends on the party alleging the fraud, whether the sale is voidable. He may avoid it if he so elect. He has his choice. He may treat the sale as a nullity, and reclaim his goods; or affirm it, and claim damages."

So PARSONS, C. J.: "The purchaser may return the unsound horse, and the boot, if any; or he may retain the horse, and sue for damages.

So in *Shields* v. *Potter*, OAKLEY, J., says: "They could have continued to receive the iron (inferior in quality), or they could have refused, and repudiated the contract. They could not do both. They were bound to either affirm the contract, or rescind it. They could restore the iron already received, and sue for the payment made; or they could receive the iron, and sue for damages for breach of contract. But they could not retain the part of the iron delivered, and sue at the same time for the money they had paid."

In *Brainard* v. *Holsapple*, 4 Iowa R. 485, the Supreme Court say: "The rescission of a contract is the converse of a specific performance. It requires a stronger case to procure a rescission of a contract, than to resist a specific performance of it."

In *Remar* v. *Nullin*, 3 Iowa R. the Court say: "*Nullin* will not be permitted to hold the land received in exchange, sell and dispose of it for a price, and then come into a Court of chancery, and procure its aid to rescind. He must, within a reasonable time, first place, or offer to place, the other party in *statu quo*. The evidence shows that he occupied the *Nolan* farm and improvements for two years, and then sold them for 160 dollars. To grant the relief sought, under such circumstances, would be to contravene one of the plainest

principles of equity. He was bound to do equity on his part, by restoring the consideration received by him, before he could be relieved in a Court of equity. He cannot avail himself of the benefit of the contract, and then call successfully on the Courts for a rescission."

In *Barickman* v. *Kuykendall*, 6 Blackf. 21, this Court say: "The vendee, having occupied the land several years, under the contract, receiving the rents and profits, the parties could not be placed in the same situation they were in before the contract was made; and consequently, if the contract was valid, the vendee could not rescind, and sue in assumpsit for the money paid."

So in *Bruen* v. *Hone*, 2 Barb. 586. "There are," says the Court in that case, "other reasons why the plaintiff's claim ought not to be successful in this suit. A leading principle of jurisprudence is, that he who seeks equity must do equity. By the agreement which is sought to be rescinded, he received a release for one hundred and thirty-six out of two hundred lots of land, free from the incumbrance of a debt for which they were pledged. He does not in his bill offer to restore these lots to their former position. Nor indeed can he do so. For it appears that he has assigned them and passed away from himself all control over them. To grant the prayer of his bill now, would be to secure to him all the benefits of the contract, yet release him from a very important part of its obligations."

But *Newell* and *Beach* seek, on the one hand, to rescind and to recover what they had paid *Gatling;* and, on the other, 600 dollars for their damages, expenses, &c., and 10,000 dollars in damages. In brief, they seek rescission, and also to confirm the contract by giving a judgment for its breach. For this incongruity, and in view of the leading cases just cited, and hundreds of others following their lead, scattered all through the books, it is clear that the complaint was radically bad on demurrer.

· The ruling of Judge BRYANT, sustaining the demurrer as to the rescission, was clearly correct—was the clear law of the case, and should have been sustained.

It is well known that complaints for rescission were formerly of chancery jurisdiction. That species of relief was administered by decree to all the parties in interest. But it was only upon terms. The party seeking that relief must have placed himself in a position to be entitled to it. To enable the chancery Courts to carry out their favorite maxim of administering complete equity in such cases, there were several well established rules of equity pleading, by which a bill for rescission was to be tested. To these rules, in brief, allusion will presently be made.

While the new practice has abolished the distinction in form between law and equity, and changed the mode of adducing evidence and the form of trial, it is not presumed that rescission can be had on any easier terms than formerly. The rule as to the material allegations of the complaint must be the same. The plaintiff must still make out a case by proper allegation. The change of forum has not changed the law. It is equity administered indeed in a different form, but still, in substance, equity as it heretofore existed. The legislature did not attempt to change the thing, but only changed its name and its drapery.

It still remains the law, that every material statement and allegation essential to a good bill in chancery, for rescission under the old practice, is still essential in a complaint for the same purpose under the new. In this respect,

*VanSantvoord, Morrell,* and other practice text writers in *New York,* reviewing the practice decisions of that state, all concur. The code, they say, adopts substantially the equitable modes of pleading with the legal mode of trial. It leaves legal and equitable principles in all their vitality, to be applied as the exigency of each case may require.

What, then, was essential, and is still essential, in a complaint for a rescission?

It is not enough to aver that the complaining party was defrauded; or that an improvident contract was made. All that might be admitted, and yet *Newell* and *Beach* would not be entitled to have the contracts in question rescinded. At the very threshold of their case, they are met with such well settled doctrines as these, admirably summed up in the second opinion in this very case (9 Ind. R. 576), thus:

"It is not, however, every erroneous representation that will entitle a party to such rescission. The representation must be as to a fact or facts, and go to a material matter. It must be one on which the party to whom it is made has a right to and does rely. If it be mere matter of opinion, or exaggerated general representation of quality, capacity, or usefulness; or be as to a matter equally open to the knowledge of both parties; or be one not relied on; the representation, though untrue, will not vitiate the contract. Especially will such be the case where the parties stand mentally on equal footing, and in no fiduciary relation. The law will not relieve a man thus circumstanced, from voluntarily neglecting to exercise common sense and judgment, if he has them."

So, again, this Court held that, "however much the moralist might censure the address sometimes resorted to by men of keen business habits to effect advantageous contracts, misrepresentations of the value or quantity in market, when correct information on those subjects is equally within the power of both contracting parties, with equal diligence, do not, in contemplation of law, constitute fraud." *Foley* v. *Cowgill,* 5 Blackf. 18.

"It is difficult," says *Chitty,* "to imagine that a general misrepresentation as to value, the truth of which a party has an equal opportunity of ascertaining; or the concealment of a matter which an individual of ordinary sense, vigilance, and skill, might discover, can in law constitute fraud. Thus, if a purchaser, choosing to judge for himself, do not avail himself of the means of knowledge open to him, he cannot be heard to say that he was deceived by the vendor's representations." Chit. on Cont., 9th ed., marg. p. 591. The authorities on this point are also elaborately examined in the late case of *Lyon* v. *Bertram,* 20 How. 149, and in the late case in this Court, *Cronk* v. *Cole,* 10 Ind. R. 485, commonly known as the barley case.

Tested by these authorities, the complaint is radically defective in this particular also. We have already seen that there were two contracts for the patent right of the drill, of 3,000 dollars each. The one was made *November* 20, 1850; the other, the *February* following. It has been further seen that *Beach* had made a further separate contract some time in *September,* 1850, for four counties in *Ohio.* What were the appellees doing during all the time from *September* till *November?* and from the 20th of *November,* 1850, till the 5th of *February,* 1851? During the time intervening between these purchases, what hindered them from making inquiries and experiments as to the value of their purchase? Nothing. What were they doing? Were they studying the theory

of the drill as a mechanical invention? They might have done so—they had
ample time to do so. Were they inquiring of the farmers who had used it, as
to its practical operation? Like sensible men, they traversed *Ohio*, making in-
quiries, procuring certificates of the utility, value, and superiority of the drill.
These certificates they had printed. If not good evidence of the facts stated
in the certificates, they were good evidence of the knowledge these men had;
and that they made the second purchase of *February* 5, 1851, on their own
judgment, and not in consequence of any representation of *Gatling*. This in-
vestigation was made in *Ohio*. They made the second purchase shortly after
their return from *Ohio*. That purchase embraces only *Ohio* territory. And
do they now pretend to say they were defrauded in this second purchase—that
they did not act on their own judgment?

The parties were on equal footing before, as to the topography of *Ohio*. Its
adaptation to wheat culture by drill, was as well known to the appellees as to
the appellant. But the appellees did not leave it to presumption, as to the ex-
tent of their topographical lore. What they had ample time to do—what it
was their right and duty to do—they did. They went to *Ohio* and investigated
the whole matter for themselves. Such a course, we should expect, would at
once suggest itself to men so prudent, shrewd, intelligent, and vigilant as the
appellees are known to be. Nor is it to be doubted that the result of that in-
vestigation was highly favorable to the drill, and to the speculation they had
already made. For we find them, on their return in *February*, doubling their
investment. They purchase other territory to the amount of 3,000 dollars—
thus investing in the drill 6,000 dollars. They added twenty-eight counties to
the territory already owned by them in *Ohio*. All this they did; and yet, in
the face of it all, they aver that they relied upon *Gatling*, and were defrauded!

In point of fact, it is wholly immaterial whether they had so inquired or not.
If they inquired as they might have done, and as they did, they were fully in-
formed. They will be presumed to have acted upon their own judgment. If
they did not inquire, when they had the time and opportunity to do so, it was
their own folly and negligence. Their pretense of fraud is a false clamor,
which it is the constant practice of the Courts to discourage. All unfounded
allegations of fraud are discouraged by the Courts; and if made, and not es-
tablished, the plaintiff will not be allowed to resort to any secondary grounds
of recovery. *Eyre* v. *Potter*, 15 How. 56.—*Fisher* v. *Boody*, 1 Curtis, 211.
When, by the exercise of ordinary prudence and diligence, either party may
rely on his own judgment, representations, though false, will not be considered
fraudulent. *Hobbs* v. *Parker*, 31 Maine R. 143.

In either event, they have no right of rescission. In the *February* contract,
they relied upon themselves. There is not even a possible pretext for rescis-
sion there. The *November* contract cannot now be impeached; for the contract
of *February* was of itself a solemn act of approval and confirmation of the
*November* contract. Here are two contracts about precisely the same subject-
matter. Admit that the first is made on the confidence of the representations
made by *Gatling*; the second is clearly made on their own judgment. If they
were negligently ignorant of the value of the drill, when they made the first
contract, they had gone and examined for themselves, and acted on their own
judgment when they made the second. The second purchase was made under
circumstances in which, according to all the authorities, there could be no
fraud. The second purchase so made by the same party, from the same party,

about the same subject-matter, approves the first, and wipes out and purges from the first, every shadow or pretense of fraud.

If these two contracts could possibly be regarded as only one transaction—parts of the same thing—then they were not completed till *February* 5, 1851. The same argument applies to it as a single transaction, which applies to it as separate contracts—only with still greater force. If, in the language of the books, *Newell* and *Beach* did know, or with proper diligence might have known, what they were buying, they have no merits—no right to appeal to the Courts to rectify their want of prudence and diligence. *Hough* v. *Richardson*, 3 Story, 629.—*Foley* v. *Cowgill*, 5 Blackf. 18.—*Cronk* v. *Cole*, 10 Ind. R. 485. Before the conclusion of the contract in *February*, the appellees had examined for themselves. Instead of stopping then, and seeking to rescind what they had done, they double their purchase, and thus complete the matter, regarded as a single transaction. If a vendee becomes acquainted with the fraud before completing his contract, equity will not relieve. *Pratt* v. *Philbrook*, 33 Maine R. 17. Of course the same rule applies where the party failed to exercise ordinary diligence.

Add to this the indorsement of acceptance by *Newell* and *Beach* on the *Minturn, Allen & Co.* contract, *April* 17, 1851, and it would seem to require a considerable degree of presumption to seriously ask a Court to entertain such a case.

Another fatal defect of the complaint is, their failure to tender back to the appellant, before suit, all they had received from him, and its results, in their hands. In other words, they do not show, by their complaint, a readiness to place the parties in *statu quo*. The deed tendered in *August*, 1853, embraced but part of the territory. Hence, they tendered no sufficient deed to the appellant before suit. The deed they tendered after suit, came too late, as we shall presently show.

That deed conveys all the right, title, and interest which *Newell* and *Beach* then had in the patent. It is simply a quitclaim of their then present interest, without any warranty against their previous acts of lease, sale, &c. It was essential to the validity of any deed tendered for the purposes intended, that it should warrant, &c., against the grantor's own acts. Such a form of deed was indispensable to their right of action to rescind. Even then, if the grantors were shown to be insolvent, such a form of deed would not be sufficient. They could not place themselves in a position to rescind unless they had restored, or offered to restore, everything they had received on the contract, and all its accessions, in their hands. A partial tender was, in legal contemplation, as though there had been no tender.

This complete tender is essential, and should be made before suit. It is simply doing equity, or offering to do equity, by the party who seeks equity. To enable the Court to decree a rescission, the appellees should have made a full exhibit of all they had done under their contract. If they had sold any drills or territory, they should have brought the proceeds, or the securities, into Court. What they had sold or incumbered, they could not tender to *Gatling*. Hence, they could not put him in *statu quo*. It is alleged in the answer, and proved, that they had incumbered the territory. If thus bound to restore what they had received, were they entitled to a rescission unless they could so restore? And on what principle could they keep the proceeds of any sale they may have made? Suppose they had sold one county in *Ohio*, could they,

by tendering a deed for all the residue of the purchase, keep the proceeds of that one county, and still be entitled to rescind? Or suppose they had sold all the territory but one county, could they claim a rescission upon the tender of a quitclaim deed for that one county, and keep the proceeds of all the balance?

The maxim that they who seek equity must first do equity—a maxim so familiar and so just—stands right in the way of a rescission on such a state of facts as this record presents.

In the foregoing suggestions it is assumed that to entitle a party to rescission, the consideration received must first be restored—the parties must be placed in *statu quo.* To this proposition the attention of the Court is now respectfully invited—more particularly as this proposition has been greatly impaired by the opinion in *Gatling* v. *Newell,* 9 Ind. R. 572—and that, too, as we respectfully conceive, without sufficient warrant from the authorities.

To clear the question of fog, let it be premised that there is no pretense in the complaint that *Gatling* had so confused the property received by him on the contract as to be unable to restore. All that doctrine of the books about the confusion of goods, &c., is wholly inapplicable to the case as to *Gatling.*

This confusion-of-goods doctrine is, however, unfortunate for *Newell* and *Beach.* If they, while they seek to rescind, have so confused, incumbered, or disposed of what they received from *Gatling* on the contract, that they cannot identify, or restore, &c., then this doctrine has a very potent application. In such circumstances, they are not entitled to a rescission. In that event, their remedy is on the contract for damages—not by rescinding it.

These things premised, the proposition above announced is best determined by the authorities. And first our own.

The contract will not be rescinded when the contracting parties cannot be placed in the identical situation which they occupied when the contract was made. *Shaeffer* v. *Sleade,* 7 Blackf. 178.

One party to an executed contract cannot rescind it without restoring the other party to his original situation. *Buell* v. *Tate,* 7 Blackf. 55. To the same effect, *Calhoun* v. *Davis,* 2 Ind. R. 532.

A contract cannot be rescinded by one party for the default of the other, unless both parties can be placed in the same situation in which they stood previously to the contract. *Chance* v. *The Comm'rs, &c.,* 5 Blackf. 441.

So while the obligee of a title-bond held possession both of the land and of the bond, he could not claim a rescission of the contract. *Osborn* v. *Dodd,* 8 Blackf. 467.—*Brumfield* v. *Palmer,* 7 *id.* 227.

A party who would rescind a contract, on the ground of fraud, must return whatever of value he has received upon it, that the parties may be placed in *statu quo.* *Cooley* v. *Harper,* 4 Ind. R. 454.—*Hardesty* v. *Smith,* 3 *id.* 39.— *Wallace* v. *McVey,* 6 *id.* 300.

In *Reed* v. *Rudman,* 5 Ind. R. 409, the return of the property was legally excused.

In *Colson* v. *Smith,* 9 Ind. R. 9, the tender was made and continued in Court.

There are numerous other authorities, more or less directly to the same point, scattered all through the eighteen volumes of our own Reports. I have quoted the language, to show the stability and uniformity of the rule as heretofore adopted and applied in this Court.

May Term,
1859.

Gatling
v.
Newell.

The same rule is adopted and applied with equal uniformity in other Courts. Their language is far more instructive and satisfactory than any comment of mine. I therefore beg the attention of the Court briefly to some of these authorities.

"Something has been said, that, if a thing was of no value, it need not be restored. That is not the law. It is not enough that it be of no value to the party who should return it, and yet of great value as a link to enable the other party to enforce some right attacked, or remedy growing out of it. At all events, it is not for the party seeking to rescind, to excuse his not returning it, in that way. Here is an authority. Thus, A. took a corporation lease, which was void, and assigned it to B. It was held that B. could not treat the contract as rescinded, and recover the price paid by him, without first reassigning the lease. (And this must be first done before suit, and that, too, when the lease was void, and of no value.)" Martin v. McCormick, 4 Sandf. 366.

In the case of The Matteawan Co. v. Bentley, 13 Barb. 641, Bentley had purchased goods of the company, and given his notes for part of the purchase-money. The company discovered that fraudulent representations had been made, and demanded back the goods without tendering the notes. The Court held that the action to recover the value of the goods could not be maintained, though the notes were produced on the trial, and offered to be surrendered. Accordingly, also, numerous other cases. Wheeler v. Baker, 14 Barb. 596.— Bruen v. Hone, 2 Barb. 586.

In Voorhees v. Earl, 2 Hill, 288, the authorities up to that date, are elaborately reviewed by Judge Cowen, with the following results:

1. That a party seeking to rescind, must first put the other party in statu quo, by restoring whatever he had received on the contract; otherwise, he cannot rescind and recover the consideration he had paid.

2. Nelson and Bronson held—Cowen dissenting on an immaterial point —that the plaintiff cannot rescind in part, even though fraud in the sale should be shown; and that not having attempted to rescind in toto, by restoring all that had been received, the remedy was confined to the contract of warranty. Accordingly, also, a party defrauded in a sale or purchase, may rescind the contract by restoring the parties to the situation they were in when they contracted. 1 Barb. Ch. R. 125.

In order to rescind, both parties must be placed in the identical situation which they occupied when the contract was made. Chit. on Cont., 9th ed., p. 750, citing 5 East, supra.—2 Young and Jer. 278.

A party defrauded in a contract, has his choice of remedies. He may stand to the bargain, and recover damages for the fraud; or he may rescind the contract, by first returning what he bought, and then recover what he had paid or sold. Campbell v. Fleming, 1 Ad. and El. 40.

In another late case, it is said, the decision in Hunt v. Silk lays down a very clear and just rule in these cases. The rescission must place the parties in statu quo; otherwise, the party seeking to rescind will be left to his action for damages. And where a party elects to rescind, he must return the consideration received before any right of action accrues. It is not enough to notify the party committing the fraud to come and recover the goods. Beed v. Blanford, 2 Young and Jer. 278.

In Norton v. Young, 3 Greenl. 30, the defendant had exchanged with the plaintiff a recognizance to confess, &c., signed by a third party, for store goods.

The transaction was fraudulent. On discovering the fraud, the plaintiff wrote to the defendant that he would have nothing more to do with the recognizance, and that he should come and pay for the goods exchanged for it. But no offer was made to return the recognizance before suit. In an action for the price of the goods, treating the contract as rescinded, the Court say: "It has been urged that a return of the recognizance to the defendant was not necessary to vest the right of action in the plaintiff, but that as soon as he had given notice of the intention to rescind, his right of action had matured. The cases cited do not support this position. Before any right of action accrued to the plaintiff to recover the value of the goods, the recognizance should have been returned to the defendant. Things must be put in *statu quo* to enable a party to rescind a contract." Accordingly, also, *Kimball* v. *Cunningham*, 4 Mass. R. 502; *Conner* v. *Henderson*, 15 *id.* 319; *Shields* v. *Potter*, 2 Sandf. 262—opinion by OAKLEY, C. J.

Much more might be cited to the same effect. If the foregoing authorities do not settle the question of rescission on the complaint at bar, against *Newell* and *Beach*, it may be safely asserted that no question can be settled by authority.

The deductions from these authorities are—

1. That unless the whole property, or title, received on the contract, is restored, no right of action can accrue in any case for rescission.

2. That where, as in this case, a deed is necessary, it must be a complete deed—which will secure, and which purports to secure, to the party, all he had parted with.

3. That in such case, a mere quitclaim deed, without the grantor's covenant against incumbrance done or suffered by him, is not sufficient; nor is a deed sufficient which, like that tendered *August* 31, 1853, does not embrace all the property purchased.

4. That the tender of an imperfect deed is as though there was no tender, and confers no right of action to rescind.

In this case, there was no proper deed tendered before suit. In all the above cases, if a proper tender is not made before suit, and kept up in Court, it is idle to talk about rescission. Situated as they were, the property received so incumbered that it could not be restored, or if unincumbered, was not restored, nor offered to be restored, before suit, they had no right of action to rescind. Their remedy was on the contract for damages. It is further respectfully submitted that the former decision in 7 Ind. R. 147, on demurrer to the complaint, was, in this respect, also erroneous.

Again, as an action to rescind, was this case commenced in a reasonable time? It is proposed to call the attention of the Court briefly and respectfully to this point also, and to the dates already given, and a few cases.

It is true, we are told that this question of reasonable time is a mixed question of law and fact, and as such, passed upon by the Court sitting as a jury. If a question of fact, the rule established by this Court, and uniformly adhered to, is a salutary one, rarely to be relaxed. Yet it has been relaxed several times (*Cook* v. *Noble*, 4 Ind. R. 221), and should not be regarded as wholly inflexible. If there ever was a case in which it should have been relaxed, it was that at bar. But if the question, whether the application to rescind was made in a reasonable time, is one of law, then the Court erred in the opinion in that behalf in 9 Ind. R. 572.

That delay is fatal to the right to rescind, has been long and well settled. When a party intends to rescind, he must do so promptly on the first intimation of breach or fraud. If he negotiates afterwards, he waives his right to rescind. *Lawrence* v. *Dale*, 3 Johns. Ch. 23, affirmed in the Court of Errors under the title of *McNeven* v. *Livingston*, 17 Johns. 437.—*Brinley* v. *Tilbets*, 7 Greenl. 75.—Chit. on Cont. —.—1 Smith's Lead. Cases, 237.—4 Hill, 184.— 4 Denio, 524.

If, after discovering the fraud, the party deal with the property as his own, he cannot rescind. Nor would the right to rescind be revived by discovering other incidents in the fraud. *Campbell* v. *Fleming*, 1 Ad. and El. 40.

Such is the whole tenor of the authorities, especially the modern, overruling the *dictum* of Lord REDESDALE, in *Murray* v. *Palmer*, 2 Sch. and Lef. 486, and the *dictum* of Lord ERSKINE, in *Morse* v. *Royal*, 12 Ves. 373, so much relied upon, in both printed and oral argument, by counsel for the appellees. Besides, the *dicta* themselves never had any application to the case; for there is no pretense but that *Newell* and *Beach*, at the time of the several acts of confirmation, viz., the second contract, in *February*, 1851, the indorsement of the *Minturn, Allen & Co.* contract, in *April*, 1851, and the letter of *Beach*, in *March*, 1853, knew all about the subject-matter they had purchased, and confirmed it with their eyes open. The *dicta* of REDESDALE and ERSKINE have, therefore, no application.

The modern authorities do not say, nor do we pretend that they say, that acts of confirmation will deprive the party of all remedy in a contract tainted with fraud. What we do say is, that according to those authorities such acts of delay, or of confirmation, deprive the party of his remedy by rescission. He is still left his right of action for damages. The modern authorities hold such acts to be an affirmance of the contract—as evidence of his election to look for his remedy to an action on the contract, and not to a rescission of it.

If, therefore, the party delays to seek his remedy by rescission; or if he deals with the property after the discovery of the alleged fraud; he forfeits his right to rescind. So it is settled in *Indiana*. In *Cain* v. *Guthrie*, 8 Blackf. 409, it is held that if a party desire to rescind a contract on the ground of mistake or misrepresentation, he should promptly communicate the facts on which he relies, and his intention to rescind, to the opposite party. To the same effect are *Johnson* v. *M'Lane*, 7 Blackf. 501, and *Shaeffer* v. *Sleade, id.* 178.

A contract will not be rescinded unless the application be made within a reasonable time. 8 Blackf. *supra*. In the leading case already cited, *Masson* v. *Bovet, supra*, the Court say, he will have his remedy by rescission, provided he seeks that remedy by returning what he has received, at the earliest moment after he has knowledge of the fraud.

So applications to rescind must be made as soon as the cause for rescission is discovered. *Ayres* v. *Mitchell*, 3 Sm. and M. 683.

As to what is a reasonable time—is it a question of law, or of fact? We proceed to respectfully and briefly state a few authorities out of a large number (in opposition to the opinion of this Court, in 9 Ind. R. *supra*), that it is purely a question of law, and not a mixed question of law and fact.

Thus, whether application to rescind has been made in a reasonable time, is a question of law for the Court, and not of fact for the jury. *Holbrook* v. *Burt*, 22 Pick. 546.

In *Kingsley* v. *Wallis*, 14 Maine R. 57, the suit was on a note for the pur-

May Term,
1859.

GATLING
v.
NEWELL.

chase-money of an interest in a patent right. The deed and note were dated April 9, 1834. The defendant reserved the right to rescind if he could not sell the patent right, or if he got sick of his bargain; but no time was fixed. In June following, he offered to give up the bargain, and return the deed to the plaintiff, and demanded his note. The Court held—

1. That what, in such a case, was a reasonable time to rescind, was a question of law.

2. That a delay of two months and a half before making the offer to rescind, was beyond a reasonable time.

The decision on the circuit, made by WHITMAN, C. J., was affirmed on appeal.

This case is not merely analogous to that at bar; it covers it completely. Accordingly *Ragan* v. *Gaither*, 11 Gill. and Johns. 472; 3 Johns. Ch. R. *supra;* 2 Greenl. 249; *Warren* v. *Daniels*, 1 Wood and M. 90.

It has been seen that *Beach's* first contract for the patent, was in *September*, 1850; the second, *November* 20, 1850; the third, *February* 5, 1851. *Gatling* left the state in *July*, 1851, about ten months after the first, eight and a half after the second, and nearly six months after the third contract. Two or three days would have sufficed to carry *Newell* and *Beach* to either of the territories they had purchased. Was it due diligence in *Newell* and *Beach* to slumber over their purchase thirty months, when the value of the drill could have been tested and ascertained in as many days? Even on the face of the complaint, it is apparent that they had ample time to ascertain every fact alleged to operate as a fraud, and that, too, long before they made the second contract, in *February*, 1851; long before they indorsed the *Minturn, Allen & Co.* contract, in *April*, 1851; long before *Gatling* left the state, in *July*, 1851; long before *Beach* wrote his negotiating letter, in *March*, 1853.

Equity does not give parties forever to discover defects or fraud, any more than to elect what they shall do about it when it is discovered. Equity does not subserve negligence, nor extend its remedies to improvident contracts. *

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*

The appellees had, by their own showing, ample time to investigate, and make themselves acquainted with the whole thing. They complain of the *Chicago* contract. Was there not such a contract, and a profitable one, too, for *Mayhew?* Even had it been otherwise, *Indianapolis* and *Chicago* were not twenty-four hours apart; *Mayhew* was almost their next-door neighbor. What hindered them to investigate that matter sooner? So of the *Minturn, Allen & Co.* contract; *Indianapolis* and *Urbana* were connected pretty directly by railroad. Why did they not, when in *Ohio*, in the winter of 1850, seek *Minturn, Allen & Co.*, and ascertain the facts for themselves, before they made the second contract, in *February*, 1851? \* \* But they did, afterwards, seek *Minturn, Allen & Co.*, and did, on the 17th day of *April*, 1851, with the contents of that contract before them in all their length and breadth—with *Minturn, Allen & Co.* before them, face to face, with their own hands, wipe out every shadow of fraud by the following indorsement:

"Having purchased the territory for which the within contract was made, we do hereby agree to conform to its terms.                    *Newell* and *Beach.*"

It would be highly instructive to see the learned counsel produce authority to do away the proper legal effect of that indorsement. The *dicta* of ERSKINE and REDESDALE don't meet the case.

But they allege that *Gatling* left the state in *May*, 1851, and did not return till the spring of 1853; and that, hence, they could not proceed to rescind. We take them at their word, though it is contrary to the fact. Under the authorities above cited, they were then too late. They had slumbered some six months. But what if he was out of the state? Did that hinder them from filing their bill to rescind, and continue for process? And what had become of the process by publication, or of attachment, during that time? Besides, *Gatling* had agents at *Lebanon* and *Indianapolis*, of whom they could have made inquiry. Their complaint alleges no sufficient excuse, because they have shown in it no diligence in making inquiry for *Gatling*. The rule is this: A party alleging and relying on ignorance, must show that he used due diligence to obtain information, and that, too, in vain; or that he could not have obtained the necessary information by the use of such diligence. *Wasson* v. *Waring*, 15 Beav. 151.

Nowhere, in the complaint, is it alleged that they used any diligence whatever to find either *Gatling* or his agent. Not a word of it. But in the face of all these facts—the equality of the parties; the length of time elapsed before suit, or notice of intention to rescind; the length of time between the *November* contract and the *February* contract, affording such facility of inquiry; the utter failure to prove fraud in the *Chicago* contract; the indorsement of the *Minturn, Allen & Co.* contract; the failure to tender back all they had received, before suit was brought; and the overwhelming evidence of the value and utility of the drill; in the face of all these, the case is still urged on, *  *  *  *  * no matter what acts of negligence, what acts of confirmation, or what acts of waiver the appellees might have done, or what fatal *hiatus* there might be in their complaint and their proof.

To me it seems a perfectly plain case—a clear, legal, open-and-shut against *Newell* and *Beach*, without even a shadow of merit. It is one of those cases in which, according to the authorities, the Courts should be astute to check such groundless charges of fraud. The authorities cited fully sustain Judge BRYANT's first opinion, in holding the complaint insufficient for rescission.

*      *      *      *      *      *      *      *      *

The evidence shows what could be done with the drill in *Illinois*, when it was in the right hands. The success in *Illinois* fully justified every representation of value, utility, and the profits to be realized upon it, made to them by *Gatling*. There is not a single authority that the mere speculative representation of what a thing would be worth, even if exaggerated and false, was ever adjudged fraudulent. Price, value, and prospective profits, are mere matters of opinion, or at least, of common intelligence. *  *  *  *  *  *  *  *

I have thus very imperfectly, but with entire respect to the Court, pointed out some of the errors into which it is conceived the Court has fallen, in its former rulings in this case. I have done it the more freely, because I had taken part in these decisions. But the Court, as now composed, can but feebly appreciate the bearing of the excluded evidence, unless they make themselves familiar with the record in all its details, which they will no doubt do.

Let us now inquire—

1. What were the issues joined between the parties?

The foundation of the particular issue which the bill of exceptions applies to, is on record, in these words, viz.:

"The plaintiffs say that the said representations so made by defendant were

false, fraudulent, and deceitful; and that the interest so purchased by them of said defendant, is and was entirely worthless, and of no value whatever."

The corresponding allegation in the second paragraph of the complaint is in these words, viz.:

"That the representations so made were false, and fraudulent, and deceitful, and known to be so by the defendant; and were made by him with the intent and design to cheat and defraud the plaintiffs in the premises; and that the interest so purchased by them of the defendant is entirely worthless, and of no value whatever."

The first allegation relates to the first contract by *Newell* and *Beach*, of *November* 20, 1850, and is in the first paragraph of the complaint.

The second allegation relates to the contract of *February* 5, 1851, in the second paragraph.

The false representations alluded to are, as to the *Minturn, Allen & Co.* contract, which they indorsed; as to the *Chicago* contract, which were substantially true; as to the topography of *Michigan*, which, as in *Cronk* v. *Cole*, 10 Ind. R. 485, was as well known to them as to him; as to the great profits they would realize from the patent, which were mere opinion, never, as we have seen, held to be fraudulent (9 Ind. R. *supra*); and yet those were the false representations. The prayer was for rescission, or 10,000 dollars damages.

But the great fact in issue, indeed the only material one, was, that the machine itself—the right to sell and use it—was wholly worthless and of no value. This fact was put in issue by denial in various forms. There was a general denial of every material allegation in the complaint. Several allegations of the complaint were denied specifically, and in detail. Thus, among others, *Gatling* denies that the patent right, &c., is worthless, but, on the contrary, alleges that it is of great value. In addition to these numerous detailed denials, the answer sets up various matters of delay, waiver, &c., by way of avoidance. To none of the paragraphs of the answer was there any demurrer, but only a general denial.

Such was the chief issue joined between the parties—the value of the drill, as a patented improvement, being the essence of all combined.

2. What did the trial by the *Court* embrace?

It is sufficient to say that it embraced all these issues. This proposition needs no comment.

The chief issue, then, being whether the interest purchased by the plaintiffs from the defendant was, as alleged in the complaint, entirely worthless and of no value whatever, was the evidence offered and excluded, pertinent and relevant to that issue?

The burden of proving that the patent interest was worthless, was, by the pleadings, imposed on the plaintiffs below. It was the right and duty of the defendant to rebut and repel it, and show that it was valuable. To do this— to prove that it was valuable—what range and selection of means was then in the power of the defendant?

*Gatling* could not prove its value by actual experiment in any of the territory sold to the plaintiffs, because by his deed of transfer to them, he had necessarily excluded himself from making experiments, or testing the value of the drill, within their territory. He could neither sell nor use the drill in the territory transferred. So that he could not lay the foundation for any such evi-

dence. In such circumstances, he could neither be expected nor required to produce it.

Nor could *Gatling* glean any evidence from that quarter arising out of the acts of the plaintiffs. For their want of skill and sagacity in presenting the claims of the drill to the public; the fact that they never presented the drill at all in nineteen-twentieths of their territory; the further fact that they never manufactured any drills, not even for samples; and the further great fact that they never even experimented with the rise-and-fall tooth drill—the very thing they had purchased; all these combined, shut *Gatling* out completely from any of the ordinary means of proving the value of the drill in *Michigan*. Their deeds show it was *Gatling's Premium Grain Drill* they had purchased. Instead of that, they experimented with, exhibited, &c., the stationary tooth drill. If they were not such highly intelligent gentlemen, we might well doubt whether they knew the difference. At all events they made no experiments in their own territory with *Gatling's Rise-and-Fall Tooth Premium Grain Drill*, from which *Gatling*, or anybody else, could glean any evidence of its value. If they had, this suit would never have been brought; they could have sold profitably.

So that neither on his own account, or on theirs, could *Gatling* be legally expected to produce evidence of its value from the territory he had transferred to the plaintiffs. There were no means then—no instruments of evidence in that direction, only what of prejudice the plaintiffs had here and there raised against the machine.

What, then, was he to do? He offered his patents from different governments. They were rejected. He offered his medals awarded on various occasions for the best drill in use. They are also rejected. The very certificates of its value, which *Newell* and *Beach* had collected and printed, and which had been embodied in their depositions, are stricken out. What was he to do?

In the language of the fourth bill of exceptions—"The defendant offered to prove, by *James B. Hart*, that there was then a demand for *Gatling's Premium Grain Drill* in the state of *Illinois*, where the drill had been tested; and to prove, also, the value and success of the drill in *Illinois;* and also to prove what sales had been made in that state. The defendant offered to prove this to rebut the charges of fraud and false representations respecting the *Mayhew* contract; and to rebut the charge of want of value in the drill." This was excluded only as to sale and demand prior to the contract, and during the ensuing season.

The fifth bill of exceptions was, that the defendant offered to prove by *Hart* what sales of said drill and territory *Royal Mayhew* had made in *Illinois*—*Mayhew,* the person referred to in the complaint—to repel the charge of fraud, and to show the value and demand for the drill where it was known. But the Court excluded that also, save as to the time prior to the *Beach* contract, and the ensuing year.

Now, then, let us inquire—

1. As to the pertinency of the evidence.

2. The propriety of its limitation.

1. Its pertinency. The pertinency and relevancy of the evidence is admitted by the Court below, in the very act of limitation. Whatever occurred prior to the *Beach* contract, and for the ensuing year, that Court and this Court admit was good evidence. It was relevant in two ways to the case made in the complaint. It was pertinent to the issue of fraud joined on *Mayhew's Illinois* con-

tract. It was pertinent to the broad and all-important issue of any value what- May Term,
ever in the right patented. All this, the Court below ruled as to the years 1850 1859.
and 1851, and there is no exception taken on their part. They cannot now
complain of it. Their argument against it at this time is about of a piece with GATLING
our argument against the former decisions of this Court in this case; and will NEWELL.
probably have as much weight.

Now this was the best evidence which, in the circumstances of this case, was
accessible. It was the only evidence open to *Gatling*.

But it was pertinent and relevant in another sense than anything conceived
by the appellees. Suppose, on the introduction of gunpowder, a man having
the patent for that discovery, sells the right to make, vend, and use the article
there to *Newell* and *Beach;* representing that *Michigan* is one of the best ex-
plosive states in the *Union;* that gunpowder will explode there very freely, &c.,
&c. Having thus sold *Michigan*, the vendor can do nothing in that state in the
way of sale. He cannot, consequently, furnish any test of its value directly
within that territory. Suppose *Newell* and *Beach* make no proper offers or ex-
periments there either—but taking saltpetre instead, offer that as the explosive
substance called gunpowder. They fail. Years after they come back and al-
lege fraud. They say that the vendor falsely represented that *Michigan* was a
first class explosive country, where gunpowder would readily explode. Where-
as, in fact, gunpowder would not explode in *Michigan*, and, therefore, the right
to sell was worthless, and of no value; and for this fraud, they besought the
Court to rescind the contract.

This is exactly a parallel case. This mode of cultivating wheat, by a drill,
is a process not affected by township, or county, or state lines. Wherever
wheat will grow, it remains true that the drill is the best mode of cultivation.
It is a process not affected by climate or latitude, in contradistinction to a mere
local, artificial application. It is like a machine or process for the application
of electricity, or steam power, or gunpowder. It is true that all these will be
more or less affected by the state of the atmosphere—that is, in fact, by the
climate. Whether in this or that locality the process can be applied profitably
in any of them, wheat included, is another question. Wherever wheat is a
staple production, the process by drill is applicable. The Court know, as a
matter of common information, that both *Illinois* and *Michigan* are wheat-grow-
ing states. So is *Ohio*. The Court know, in like manner, that the soil and
climate of these states are essentially the same. The difference, if any, is in
favor of *Michigan*.

The result is, that a process valuable in *Illinois* for cultivating wheat, must
be equally so in *Michigan*. It is alleged in the answer of *Gatling*, and abund-
antly proved, that the crop by drilling is largely increased over the old-fash-
ioned mode of sowing broadcast. The inference is, that this is the effect every-
where, unless something is shown making *Michigan* and *Ohio* exceptions. This
has not been attempted. Hence, when the effect of the drill, and its value in
*Michigan*, could not be shown by *Gatling*, as we have seen, directly, the next
best evidence was the effect and value of the drill as a process for the cultiva-
tion of wheat in the adjoining state of *Illinois*. Its value as such process, was
legitimate and relevant to *Gatling's* defense, and pertinent to the issue upon
which the parties had rested their case. It was to go to the Court or jury, to
enable the tribunal trying the facts to say whether the right to vend and use

the drill, was, as alleged on the one hand, and denied on the other, worthless or not.

It is not necessary to discuss what was the weight of such evidence—whether it was strong and conclusive, or weak. If it was pertinent to the issue—if it tended to prove or disprove that issue—the party offering it was entitled to it. It was error to exclude it. Had the mind of the Court or jury been on a balance, that very evidence might have turned the scale. It was the last feather that broke the camel's back. This Court cannot tell the effect of excluding pertinent evidence, and, hence, has always held it error to exclude it.

Some authorities on this point, in our own, and other Courts, will be presently added. To affirm the judgment below, this Court will have to overrule a large and most respectable class of cases. But before citing authorities, we will advert to the limitation as to time.

2. The limitation by the Court to the year the patent right was sold, and the ensuing year (1850 and 1851), was also clearly erroneous. *Newell* and *Beach* had purchased the patent for its whole lifetime. The first years, when new and unknown, were, of course, the least valuable. The ruling confined the evidence to the period most unfavorable to *Gatling*. The purchase was of the lifetime of the patent, and *Gatling* was clearly entitled in evidence to the history and impress which its past career had made. So were both parties. That was the very material—the magazine for both. If in the period from 1850 to 1856, the history and practical operation of the drill had shown it to be worthless, most clearly the appellees were entitled to the evidence. Had *Mayhew*, with every care and skill in introducing the drill in *Illinois*, yet signally failed because of its practical inefficiency, would not the appellees have been entitled to that evidence? Most certainly. And if every year had but demonstrated its inefficiency still more—1856 the most of all—there is no Court in christendom so stupid as to exclude the appellees from such evidence. Why, then, exclude *Gatling's* evidence of its increased favor, practical utility, and value? Is it not as good and legitimate in defense as in the prosecution?

We will now beg the attention of the Court briefly, to a few authorities in relation to the relevancy of evidence, as illustrative of the observations just made.

Thus, opening our own Reports at random, we find,

That any evidence, however slight, tending to prove a material fact, should be submitted to the jury. *Crookshank* v. *Kellogg*, 8 Blackf. 256.

The rule is, that if the evidence, taken together, tends, however slightly, to prove the party's case, it must be submitted to the jury. *Babcock* v. *Doe d. Bowman*, 8 Ind. R. 110. And the foregoing case in 8 Blackf. 256, and *Haynes* v. *Thomas*, 7 Ind. R. 38, are cited.

So in *Harbor* v. *Morgan*, 4 Ind. R. 158—Whether the evidence offered was a complete defense, was not the question. It was pertinent to the issue. If it tended to support the defense—tended to make a single link in that defense—it should have been admitted.

And it is admissible, if it be the best evidence which the nature of the case will admit—if it is the best evidence of which the case is capable. *Jackson* v. *Cullum*, 2 Blackf. 228.

So evidence appropriate to one count or issue, though not so to all, must be admitted. *Irving* v. *Thomas*, 6 Shep. 418.

And it is often allowed to range, owing to the circumstances of the case. Thus, when the issue was as to the quality of wood, and the plaintiff's evidence tended to show that it was mostly unsound, &c., it was held competent for the defendant to show that the standing timber from which the wood was cut, was a good fair lot of timber.   *Green* v. *Donaldson*, 16 Verm. R. 162.

So, in the case of *Abbott* v. *Wyse*, 15 Conn. R. 254, the matter in issue was the market price of an article at *A.*, the place of delivery; in the absence of proof of the value there, evidence of its value at *B.*, seven miles distant, was offered in connection with evidence that the price at the two places was usually the same; and this was held to be admissible.

Now the Court, in the case at bar, knew judicially, as well as from the evidence in the cause, that *Michigan* and *Illinois* were both wheat-growing states. Can this Court say that the value of the wheat drill in *Illinois* did not tend to support the defense that it was valuable in *Michigan* also?

It is said that this is *res inter alios acta*. Indeed! And yet for the purpose of settling the location of the premises demanded, it is held in *Massachusetts* that the grants of adjacent lands between strangers are admissible and relevant evidence.   *Sparhawk* v. *Bullard*, 1 Met. 25.

It is no objection to evidence that it does not prove the party's whole case. If it be a link in the chain, so it is admissible.   *Haughey* v. *Strickler*, 2 Watts and Serg. 411.   It is error to reject evidence pertinent to the issue.   *Nearing* v. *Bell*, 5 Hill, 291.

Evidence conducing to prove the issue should not be excluded.   2 McLean, 596.   Evidence tending to prove the issue, though not sufficient to justify a verdict, should be admitted.   *The State* v. *McAllister*, 11 Shep. 139.

It should be remembered, says the *Kentucky* Court, that under the head of relevancy, the question is not whether the evidence offered be the most convincing, but whether it tends at all to illustrate the question.   *Holt* v. *Crume*, Litt. Sel. Cases, 499.

So, in the same state, when the question arose whether a slave had been made a gift or present to a newly married daughter, it was held admissible to show that the father had presented slaves to some of his other daughters on their marriage, for the purpose of enabling the jury to determine his intent in that case.   *Smith* v. *Montgomery*, 5 B. Mon. 502.

So facts occurring after, are admissible to explain facts occurring before, the commencement of the suit.   *McLeod* v. *Johnston*, Anth. 16.—*Ruls* v. *Knight*, 8 Mart. (La.) 267.

In support of these considerations, is the language of this Court on this very point, and in this very case, 9 Ind. R. 572, viz.:

"The complaint alleges that *Gatling's* representations of the value of the drill, &c., were false, fraudulent, and deceitful, and that the interest so purchased by them, of said defendant, is, and was, entirely worthless, and of no value whatever.

"Now the question of the then value of the drill and patent was clearly involved in the case, in whatever aspect viewed.

"1. It was one of the issues in the cause.

"2. If, instead of a rescission, the Court should give damages for the fraud, then it would be necessary to know the value of the drill, &c., in order to determine the amount of damages.   And,

"3. It was necessary to know the value of the drill, &c., in order rightly to

determine whether there should or should not be a rescission of the contract." And the whole of page 581 is to the same effect.

The appellees, in their late brief, say: "If the Court had determined that .the contract could not be rescinded, but that the appellees were entitled to damages on account of the fraud, then the question of the value of the rights would have been material in order to grant the proper measure of relief. * * * This Court cannot reverse the case on account of the rejection of evidence, material only in the event that the Circuit Court had granted a different species of relief."

It may be observed pleasantly, and with entire respect to opposing counsel, that this is certainly the latest specimen of legal logic.

1. It admits, just as we contend, that in the event of rescission being denied and damages given by the Circuit Court, the excluded evidence was pertinent.

2. The Court was not trying the question simply whether they should rescind or not, or give damages or not; but whether it was a proper case for rescission alone, or damages alone; or whether the evidence entitled the party to either. We admit, and we have shown by the instructions, that it was wholly irregular and anomalous to have issues for rescission, and also issues for damages, pending on the same contract and in the same case. If error, it was the error of the appellees. This Court inadvertently permitted the issues to be so made up. So that the lower Court was trying all together—whether *Newell* and *Beach* were entitled to rescission or damages, or whether the evidence entitled them to either. Yet, according to the logic of counsel, rescission was the only issue—the Court, *Rhadamanthus*-like, was to dispose of the alternate issue in advance, without hearing evidence.

Now, we would beg to know of counsel how the lower Court could determine whether to rescind or give damages, or refuse both, until they had heard all the evidence pertinent to either issue.

Suppose the Court had "seized the bit," and excluded all evidence relating to rescission, and admitted only evidence in relation to damages, how would the gentlemen, in that case, relish their own logic? Oh! they say, the lower Court, having determined to give damages instead of rescission, the evidence relative to rescission was rightly excluded! Suppose the lower Court had further determined against both rescission and damages, and, according to counsel's logic, excluded pertinent evidence as to both—would that phase of the case make their own position more logical and acceptable? Determined! When? How could they determine that or any other question in issue before the evidence was closed? It is preposterous.

One only answer to the quotation from *Starkie* is, that this Court simply look at the connection in which that quotation is found, and examine the authorities we have cited to the same point.

Their "popular favor" doctrine is the most ludicrous part of the case. That any action could accrue on the warranty of such an impalpable, inappreciable, and fickle thing as popular favor, is simply laughable. Why, even politicians, who make the varying shades of popular favor their study, cannot always understand the thing. Besides, the plaintiffs below had the good sense not to put any allegation in relation to popular favor in their complaint. The false and fraudulent representations are alleged to be "that the drill was the best ever invented." Have they alleged or shown that there is, or was, a better drill? "That from its manifest and acknowledged superiority, it would

May Term,
1859.
—————
GATLING
v.
NEWELL.

supersede all others ?" What was this but mere opinion ? "That they would immediately make immense profits therefrom?" What was this but mere speculative opinion, about which they could judge as well as *Gatling*, and to which, if they trusted, it was their own folly and negligence ? "That this drill culture was the best mode of raising wheat." Have they alleged, or pretended to show, that it was not the best ? On the contrary, they prove it to be the best by their own witness, *Mayhew*.

It is very convenient to seek to escape from all these, and many other such facts and issues, under the vague and impalpable fog of "popular favor." They put the value of the drill in issue themselves, by alleging its worthlessness, and demanding that they have either rescission or 10,000 dollars damages. Have they found their position embarrassing, and do they now hope to escape from it by excluding evidence, or by further befogging this Court?

We are done with a case too plain for argument. It was only the erroneous decision in 7 Ind. R. 147, that ever gave so plain a case consequence or consideration anywhere. If it be said that I participated in that, and the subsequent opinion in 9 Ind. R. 592, I answer that I did. But I did not examine the authorities. That, in our Supreme Court, is always trusted to the judge who prepares the case. This has often been thought, and perhaps is, a vice in our judicial system. I can only further say, that I have found those cases, and many others which I not merely consented to, as was the fact in these, but which I wrote, wherein it is clear that the Court erred. So far as I can discover, the great sources of error in our Courts of last resort, in addition to that suggested, is starting upon erroneous premises, or getting upon the track of, and becoming entangled in, a series of ill-considered and anomalous cases. This is the very difficulty in the two cases in 7 and 9 Ind. R. For that same reason, I know of more than one case in which the opinion of the Court was prepared by me, that ought to be overruled. So that there is no possible disrespect to any member of the Court in the freedom of comment used. It was done, because justice and correct legal principles, as applied to *Gatling's* case, required it. I should have been derelict to my client and professional duty, had I done less.

For these reasons, it is respectfully and confidently submitted, that the Court adhere to the reversal in 9 Ind. R. 592. That will deprive the parties of no right, but simply remand their claims to the consideration of a jury of their country.

Mr. *Liston*, for the appellant, concurred in the views of Judge *Stuart*, and added the following :

There are several points in the case, that I would call the attention of the Court to at this time, for the reason that two of the judges now upon the bench heard nothing of the elaborate arguments, by counsel of both parties, when this case was before the Court at any previous hearing.

The points, in addition to those presented in Judge *Stuart's* brief, that I wish to direct the attention of the Court to, are few, but they are points that were presented for the consideration of the Court, at a former hearing. Some are not noticed in the opinion of the Court, as delivered by Judge PERKINS.

1st. The eighth and ninth bills of exceptions in the record, show that the motions of appellees, on the trial below, to strike out parts of *Peaslee's* and *Mayhew's* depositions, were excepted to, as being made too late, (*i. e.*, after all

the evidence had been submitted and heard on the trial below); and the statute (2 R. S. p. 88, § 266) was referred to, sustaining us on that point. It is true, the Court held the evidence to be hearsay, or rather secondary; but that was not the point raised by the appellant. One of the main points was, that the motion should have been made before entering into trial, as required by the statute. If this motion had been made and sustained, before entering into trial, the appellant would then have had an opportunity of asking for a continuance of the cause, to have laid the foundation, if necessary, for this secondary proof; and would have been apprised, before the trial, of the objection, so as to have perfected his proof, if in his power. These portions of *Peaslee's* and *Mayhew's* depositions, were copies of documents originating with the appellees. These portions of *Peaslee's* and *Mayhew's* depositions thus stricken out, are not only important in establishing the facts of *Beach* and *Newell* having gone to *Ohio*, and fully examined the drill territory for themselves, but that they, then and there, were fully satisfied, and were well pleased with their purchase; and these documents and acts of theirs, are solemn admissions of facts made by them, and which they cannot, and did not, pretend to contradict, as will be seen by the whole record. This, then, brings me to the second point, to which I respectfully call the attention of the Court.

2d. The solemn, deliberate, and numerous admissions, made time and time again, in writing and otherwise, by the appellees, and which stand out so prominently throughout the whole record, as established facts, uncontradicted, and wholly unimpeached in any manner whatever; and which established facts eviscerate the whole case of *Newell* and *Beach*, and in any, and in every aspect in which it can be viewed, either for rescission, or for damages—even if this Court shall sustain the Court below in the matters stricken out, as set forth in the eighth and ninth bills of exceptions—yet we have the record still remaining, full of the deliberate admissions of facts by *Newell* and *Beach*, uncontradicted, and which could not be more strongly established, if they had been found to exist by a special verdict; and which, if they had been found by a special verdict, would, beyond all question, control any general verdict for the plaintiffs below, and leave not the least scintilla of right, equity, justice, or law, for any judgment in favor of *Newell* and *Beach*, and more especially for that most anomalous of all judgments, rendered by the Court below, in doing what was never attempted to be done before, and it is to be hoped, may never be attempted again—i. e., rendering a judgment rescinding a contract, and in the same judgment assessing damages for its breach. If law is a rule of action, where is *this* rule to be found? The rule never existed. It never can exist, because it is inconsistent with the nature of things. Rescission, and damages for breach of contract, are founded upon opposite principles—the existence of the one, is the annihilation of the other. They are as opposite as life and death—as light and darkness—as rationality and lunacy.

Let me here request the attention of the Court to some of the more prominent admissions of *Newell* and *Beach*, as they appear in the record; and let it be borne in mind, that these very admissions sap the gravamen from the appellees' whole case, leaving it, "like the baseless fabric of a vision," with not a wreck behind.

Both paragraphs in the complaint charge that *Newell* and *Beach* paid *Gatling* 3,000 dollars in cash, as the consideration of each contract. The whole proof shows that these charges are wholly false, as the plaintiffs never paid

one dollar in cash. To say that this might have been amended in the Court below is begging the question. We tried no such case, and if the plaintiffs below had asked for such amendment, defendant would have been entitled to a continuance, at plaintiffs' cost; and, moreover, we deny that such an entire change would have been an amendment. It would have been making a new case.

The statute requires the parties to plead facts. The plaintiffs sue to rescind, and for damages; and aver in their complaint that they paid us 6,000 dollars in cash, and the issues were made up on that averment; and lo! at the trial, the plaintiffs bring a witness on the stand, who swears it was not money that plaintiffs paid defendant, but some real estate, and an old stock of goods, &c., and the witness placed his own value upon them—although the defendant, in his answers, sets up the terms of the contracts, &c. Yet, the plaintiffs file a reply, denying defendant's answer generally. And in this surreptitious manner, the plaintiffs below were permitted to spring the question of proof of the value of an old stock of goods, the mare, buggy, and harness, and the out-lot, without the least notice, in the plaintiffs' pleadings, of any such intention. The proof of value of this property is most outrageously exaggerated. This is called a fair trial. Suppose this Court overlook, for a moment, the evidence in the record, and examine the pleadings, and compare the complaint with the judgment, and who on earth can reconcile the judgment with the complaint, and the facts charged therein, and the relief prayed for. After this view, then, turn to the evidence, and it neither sustains the complaint nor the judgment. The plaintiffs' pleadings on the record are certainly admissions against them, which the defendant has a right to avail himself of, against the pleader.

The plaintiffs aver in their complaint, that they negotiated from *March*, until some time in *July*, 1853. I ask, is this admission consistent with any established rule of law, entitling plaintiffs to a rescission? If it is, where is that established rule to be found? Certainly not in any lawyer's library. They negotiated, treated the contracts as their own, assuming and exercising a controlling negotiating power over, and with the contracts, with the drill territory purchased, from *March* until *July*, 1853, and long after they had pretended to have discovered the overwhelming frauds that, in imagination, had been practiced upon them, and now galvanized into breathing vitality by the ingenuity of counsel; one of which great galvanic frauds was, that "*Michigan* was one of the best wheat-growing states in the *Union.*"

See *Beach's* letter, of the date of 12th of *March*, 1853, to *Gatling*. The letter is made a part of *Gatling's* answer, and is made an exhibit. What does *Beach* admit in that letter? Or, rather what does he state? Not the first charge of fraud, in the most remote degree, but he merely asks *Gatling* to take back part of the drill territory, in payment of the two notes which *Gatling* held on *Newell* and *Beach*, being part of the consideration of the sale of the 5th of *February*, 1851. These two notes amounted to something over 700 dollars. *Beach* concludes the letter by these words: "This is our only hope." When *Beach* wrote that letter, he well knew all he ever pretended to know of the pretended fraud, if any ever existed. Why did he not then charge *Gatling* with it? The law required it to be done, and who can show a contradictory authority? Did not the law, then, as well as now, require it of *Newell*

and *Beach* to give *Gatling* notice of the fraud, and of their intention to re-scind? And if the fraud charged in the complaint was true, why did not *Beach* charge *Gatling* with it, then, when the law required him to do it?

\*    ·\*    \*    \*    \*    .\*    \*    \*    .\*

Exhibit No. 5, in defendant's answer, was an unrevoked power of attorney to *C. F. McWilliams*, to·sell the drill territory in the state of *Ohio*. Exhibit No. 8, in defendant's answer, was a letter written by *Beach*, from *Lebanon*, *Boone* county, *Indiana*, to *Gatling*, at *Indianapolis*, soliciting defendant to put his price on *Logan* county, *Ohio*. This letter is dated *January* 9, 1851; and by examining the record, it will be seen by *Peaslee's* testimony, that he and *Beach* had visited *Ohio*, after their purchase of the 20th of *November*, 1850, and prior to the date of this letter; and it also will be seen, by the second paragraph of the complaint, that this same county of *Logan* was part of the purchase by plaintiffs, of the date of 5th of *February*, 1851. Exhibit No. 9, was the *Min-turn, Allen & Co.* contract, about which the complaint makes such unrestricted charges of fraudulent representations by defendant. The plaintiffs, on the 17th of *April*, 1851, being then in *Ohio*, and at the shop of *Minturn, Allen & Co.*, in *Champaign* county, had every opportunity of seeing for themselves, and making inquiry of *Minturn, Allen & Co.*, and learning, in the fullest man-ner, if *Gatling* had made fraudulent representations as to said contract. The plaintiffs, with all this opportunity, then and there accepted the said contract as their own, and indorsed their acceptance thereon, in writing, in these words:

"Having purchased the territory for which the within contract was made, we do hereby agree to conform to the terms.

"*Urbana, April* 17, 1851.                     *Newell* and *Beach*."

This admission was made nearly three months after plaintiffs' last purchase, and nearly six months after the first purchase; and yet the complaint, in both paragraphs, avers that defendant made fraudulent representations to plaintiffs, respecting the terms of this contract, and that plaintiffs were induced to pur-chase from those false representations; and. that plaintiffs never discovered this fraud until after the defendant had left *Indianapolis*, the following summer.

Could any admission be stronger of the falsity of those charges made by plaintiffs in their complaint?· These exhibits, pleaded in defendant's answer, must be taken as established admissions of fact in the pleadings; for if they were not true, the plaintiffs ought to have denied them under oath, or replied some legal matter in avoidance, which they did not, and dare not do.

The plaintiffs file another deed, of the date of 13th of *September*, 1856, about three years after the suit was commenced. This is an admission that the first deed was not sufficient; and if it was necessary to make the second deed, then certainly the first deed was not sufficient; and if there was not a sufficient deed tendered before the commencement of the suit, how can plain-tiffs sue to rescind—much more, sustain a judgment for rescission? The complaint avers that plaintiffs tendered a deed, reconveying the territory, &c. If it was necessary to aver it in the complaint, (and I aver that the law re-quires it,) is it not necessary to prove it? The authorities say it is necessary. Does not this second deed, which was brought into Court on the trial, about three years after the suit was brought, admit that plaintiffs had not laid the foundation for rescission before suit brought? Need I cite authorities to

prove this to be the law? If they are required, I refer to Judge *Stuart's* brief, and to my brief, submitted when this case was before the Court on a previous hearing. [9 Ind. R. 584, note.]

The deposition of *James Kingsley* was taken on behalf of defendant, at *Ann Arbor, Washtenaw* county, *Michigan.* The witness testifies, amongst other things, as follows, to-wit: "I have resided in the state of *Michigan* about thirty years. I have traveled in many of the *United States,* and of the western states. I have the means of knowing whether *Michigan* is relatively a good wheat-growing state, and I think it is a good wheat-growing state, and one of the best in the *Union,* &c.; and is susceptible of the use of the drill," &c. *Beach* being present, then and there, at the time of taking said deposition, and for the purpose of preventing *Gatling* from taking any more depositions to prove the existence of facts, as sworn to by said *Kingsley,* then and there made the following admission, in writing, indorsed on the back of said deposition, and which is set out in the record, to-wit: "For the purpose of saving time, and the introduction of further witnesses, I admit that the facts testified to by *James Kingsley* are true. *March* 20, 1856. [Signed] *Newell* and *Beach,* by *William B. Beach.*"

After these deliberate admissions, how can the plaintiffs, or their counsel, aver anything to the contrary?

*William Brower* testifies that *Beach* told him, on his return from *Michigan,* in the spring or summer of 1851, that he (*Beach*) had been offered 1,000 dollars more for the drill territory than he and *Newell* had paid for it. And he also testified that *Beach* said, that he (*Beach*) was not trying to sell, but was leasing out, and would make more money by leasing than by selling.

*Ignatius Brown* testifies, also, to *Beach's* admissions. *Brown* was *Gatling's* agent, and went to *Beach* to demand pay for one of the notes that *Gatling* held on *Newell* and *Beach. Beach* told *Brown* to write to *Gatling* to send the other note, and *Newell* and *Beach* would reconvey territory enough to pay the notes; and never intimated nor charged any fraud whatever.

If the law can avail the defendant anything, or bind the plaintiffs by settled legal rules, applicable to the rights of others, then these admissions must settle, forever, this case against the plaintiffs. See 1 Greenl. Ev. §§ 171, 172, 174, on admissions. This point as to the admissions of plaintiffs, was raised when the case was first submitted to this Court, after the final hearing below. But in delivering the opinion of the Court, no reference is made to the plaintiffs' admissions, many of which operate as estoppels. This, I respectfully submit, is one of the strongest points in the case; and, it seems to me, is wholly unanswerable.

The most of these documents, showing the written admissions of plaintiffs, are pleaded by defendant in his answer, and operate as matter of estoppel against the plaintiffs, unless denied by them under oath, which was not done; and, therefore, not being denied under oath, they stand in the record as facts found established, and not to be passed by, nor ignored by any finding of the Court below, inconsistent with those established facts, admitted and pleaded by defendant as estoppels. I deny the right of the Court below, as the pleadings stand, to find any verdict inconsistent with those established facts of admission. See 1 Stark. Ev. part 3, § 9. The Court below had no more power to do so, than to arbitrarily mutilate the record, or to drive the defendant out of the Court house by brute force. The judge who tried this cause below,

had neither the power nor the right to seize arbitrarily upon these established facts and admissions, and put them into the general seething-pot of his judgment, and then draw off the decoction, and deliver it to us as the grand catholicon of the case. This is the first case of any importance, where this feature of anomalous practice, growing out of the new code, has been entertained with any kind of toleration by the Supreme Court.

There is another material matter appearing in the record, to-wit: *Gatling* alleges in his answer, that the lot in *Lebanon*, received by him from *Newell* and *Beach*, in part consideration of one of the contracts, was incumbered at the time by a mortgage to *Helverton*, *Mills* and *Helverton*, to secure the payment of three notes of 100 dollars each, besides the interest thereon, being *Newell* and *Beach's* indebtedness; and that *Gatling*, in his contract with *Newell* and *Beach*, agreed to pay off this indebtedness for them. *Gatling's* answer shows that he did so, long before suit brought, and he makes exhibits of the notes in his answer, which exhibits are numbered 1, 2, and 3; and he also avers in his answer, that *Newell* and *Beach* have never tendered, nor offered to pay *Gatling* back, the 300 dollars and the interest, nor any part thereof, which *Gatling* thus paid for them in cash. These exhibits and facts are not only not denied, but are admitted. Even if the novel doctrine contended for should ever become the law—that parties may be placed in *statu quo* as to the contract, and not as to the subject-matter of the contract—yet here it plainly appears from the record, showing by these admitted facts as to this part of the case, and which no process of metaphysical reasoning can control or mystify, that this has not been done, either in the one sense or in the other. Excuses have been advanced, why *Newell* and *Beach* could not place *Gatling* in *statu quo*, as to the time the patent has expired. Can any excuse be offered why they should not have tendered *Gatling* the 300 dollars and the interest, which he paid for them in paying off their mortgage indebtedness, and which *Newell* and *Beach* induced *Gatling* to do, by their contract with him for the patent right—it was part and parcel of the contract—or any excuse for not accounting for the premiums of the *Minturn*, *Allen & Co.* sales of drills, &c., and for many other matters, &c.? This point, as to these particular uncontroverted facts in the case, has never been answered, and cannot be satisfactorily answered against *Gatling*, if there is any weight in the settled doctrine on the question of rescission of contracts, contained in the following authorities, to-wit: *Hunt* v. *Silk*, 5 East, 449; *Jenkins* v. *Simpson*, 14 Maine R. 364; *Rowley* v. *Bigelow*, 12 Pick. 307; *Shields* v. *Potter*, 2 Sandf. 262; *Brainard* v. *Holsapple*, 4 Iowa R. 485; *Remar* v. *Nullin*, 3 *id.* ——; *Barickman* v. *Kuykendall*, 6 Blackf. 21; *Bruen* v. *Hone*, 2 Barb 586.

What has become of the settled doctrine of placing both parties in *statu quo*, if it is to be frittered away by the novel idea that parties can be placed in *statu quo* as to the contract, and not as to the subject-matter? It never was the law, and never can be the law, without abolishing the settled doctrine of every leading authority, on the question of placing parties in *statu quo*. The doctrine means nothing, if parties can be placed in *statu quo* as to the contract, and not as to the subject-matter. The very meaning of *statu quo* is, to place the parties in the same situation as to the subject-matter, as though the contract had never existed; or, in other words, to place the parties—not one, but both parties—in their original situation as to the subject-matter, by rescinding the contract. The rescinding of the contract, is the mere process for arriving

at the result of placing both parties in *statu quo*, as to the subject-matter. The subject-matter is the object to be affected by the process of rescission—rescission is the mere process, to accomplish the result, of placing both parties in *statu quo*, as to the subject-matter; and when this result cannot be accomplished, rescission cannot perform its office, and the party must seek his remedy on the contract, in damages for its breach.

If rescission can annul the contract, without placing both parties in *statu quo* as to the subject-matter, upon what principle, or rule of law, can the Court adjudicate the remainder of the cause, in assessing damages for its breach? Not in virtue of the contract, for that is rescinded. Then upon what principle? None that is known to the law.

The converse of the proposition will show its absurdity. Who can attach any reality to the idea of a judgment for the specific performance of a contract, that does not operate upon the subject-matter? Such an idea is simply preposterous.

Specific performance of, and rescinding a contract, are correlative remedies—they are merely different processes, operating conversely upon the subject-matter, upon correlative principles.

Contract is the mere predicate of the subject-matter. Rescission, according to established rules of law, must place both parties in *statu quo* as to the subject-matter, by adjudging that the predicate—*i. e.*, the contract—does not exist; or, if ever in existence, it exists no longer. *Statu quo* operates upon the subject-matter, the tangible substance, which is the object to be affected by the suit, and for which a remedy is sought, to place the parties in their original condition as to that subject-matter. By what process? By rescinding the predicate—the contract; and this must be done as an entirety, or it cannot be done at all—otherwise, the whole remedy sounds in damages for its breach. Assessment of damages for the breach of a contract, is not, and never has been, an adjunct remedy, neither with rescission, nor with specific performance.

The placing of the parties in *statu quo* as to the subject-matter, is rescinding the contract; but rescinding the contract without it, is not—the contract is not rescinded without it; otherwise, one, or both parties, may be deprived of rights, without a remedy.

There were three contracts—the first in *September*, 1850, for four counties in *Ohio*, for which *Beach* paid *Gatling* a mare, buggy, and harness, as the sole consideration, and *Gatling* made *Beach* a deed for the territory. *November* 20th, the second purchase was made, by *Newell, Beach*, and *Peaslee*, for *Minnesota* and *Michigan* (except three counties), for which *Newell* and *Beach* conveyed to *Gatling* an in-lot and an out-lot in *Lebanon, Boone* county, *Indiana*, as their part of the consideration—*Peaslee* paying *Gatling* his third; but the deed was made to *Newell* and *Beach*, at *Peaslee's* request, and the said four counties, of the *September* purchase of *Beach*, were included in the second deed, and *Gatling's* deed to *Beach*, of *September*, was given up. There was a mortgage incumbrance, to secure three promissory notes, on the in-lot in *Lebanon*, at the time *Newell* and *Beach* conveyed it to *Gatling*, amounting to some 300 dollars and interest, being *Newell* and *Beach's* indebtedness to third parties, in no way connected with this business. In this contract, of the 20th of *November*, 1850, *Gatling* was to pay off this mortgage indebtedness of *Newell* and *Beach*, and *Gatling* did so, long before suit was brought. *February*

5, 1851, *Newell* and *Beach* made the third contract, for some twenty-four counties in *Ohio*, for which *Newell* and *Beach* transferred to *Gatling* an old stock of dry-goods, then in a store-room at *Lebanon*, and also executed to *Gatling* their two several promissory notes, for about 374 dollars each, which have never been paid—this was the whole of *Newell* and *Beach's* consideration to *Gatling*, for the third purchase. In this last purchase, is included the county of *Champaign*, in *Ohio*, where *Minturn, Allen & Co.* resided, at *Urbana*, who had made a contract, some short time previous, for the privilege of manufacturing and selling drills,.and were to pay 10 per cent. for the privilege, on the amount of the sales of the drills that they might manufacture and sell. This *Minturn, Allen & Co.* contract had been made on the part of *Gatling*, by an agent of his, by the name of *Pope*. *Newell* and *Beach* went to *Urbana*, and accepted the *Minturn, Allen & Co.* contract, on the 17th of *April*, 1851, in writing, on the back thereof, and placed themselves in *Gatling's* stead, in this contract with *Minturn, Allen & Co.*, who manufactured and sold a number of the drills, the percentage whereof, coming to *Newell* and *Beach*, amounted to near 200 dollars. *Beach* went to *Michigan*, in the spring of 1851, and leased out, to divers individuals, the right to manufacture and sell drills for terms of years. *Gatling* had sold the mare, buggy, and harness, and the old stock of store goods, ·and the out-lot in *Lebanon*, and had paid off the 300 dollars and interest, of *Newell* and *Beach's* mortgage indebtedness on the in-lot in *Lebanon*, long before this suit was brought. These are facts, appearing in the pleadings and the record, as plainly, and beyond any question, as any facts in the case; and, without enumerating anything further of the overwhelming amount of evidence appearing in the record, these facts ought to satisfy any untrammelled mind. Look, for one moment, at the judgment of the Court below, for the magnificent conceptions of the law, of the great doctrine of rescinding a contract, and placing the parties in *statu quo*.  This judgment has·been attempted to be sustained, by the idea that it substantially places the parties in *statu quo*. *Gatling* had sold all the property that he received of *Newell* and *Beach*, long before suit was brought, except the in-lot in *Lebanon*, and had paid off the mortgage debt of *Newell* and *Beach* on that lot, as before stated; and on the contrary, *Newell* and *Beach* had accepted the *Minturn, Allen & Co.* contract (and that acceptance was, and still is now, unrevoked) on the 17th of *April*, 1851; and *Minturn, Allen & Co.* had manufactured and sold drills under it, both before and since said acceptance by *Newell* and *Beach*, and premiums and percentage had accrued to them, of nearly 200 dollars, which they either have received, or were entitled to receive, and have never rendered any account thereof to *Gatling*, in any manner. It may be said, *Gatling* may now go and receive them of *Minturn, Allen & Co.* Is there now any privity of contract between *Minturn, Allen & Co.* and *Gatling*, to entitle him to receive the money? and is not the right to enforce its payment now barred by the statute of limitations? Does it not also appear that *Newell* and *Beach* leased out the territory in *Michigan*, as already stated, and gave *McWilliams*, in *Ohio*, a general power of attorney to sell territory? And were not all these incumbrances of *Newell* and *Beach* on the drill territory, outstanding when the suit was commenced, and long before? And the record does not show that the leases in *Michigan* were ever revoked.

To say nothing of other parts of the record, how does the judgment of the Court below proceed? It rescinds the contracts at the first dash, and adjudges

*Gatling* to convey the in-lot in *Lebanon* to *Newell* and *Beach*, clear of all incumbrances. Let me ask, did *Newell* and *Beach* convey it in that manner to *Gatling?* ·Certainly not; but conveyed it with the mortgage incumbrance, which *Gatling* was to pay, and did pay off for *Newell* and *Beach*, before this suit was brought. The most the Court could do in that matter, if all other things were correct, was to order a reconveyance, with a special warranty against any incumbrance that *Gatling* may have suffered, or any person claiming under him. The Court find further, that *Gatling* shall pay to *Newell* and *Beach* 2,600 dollars and upwards in damages, and order and adjudge *Gatling* to accept the deed of *Newell* and *Beach*,·of the date of *September* 13, 1856, conveying the right which they then had in the drill territory. This deed was tendered during the term of the Court at which this judgment was rendered, and some three years after suit was brought; and then the Court adjudge *Gatling* to give up the two notes on *Newell* and *Beach*. \* \* \* \*

The new code of civil procedure has not, in the least, changed the rights of the parties as to the measure, nor as to the principles, of relief to be granted, in cases of this description. How, then, can this judgment of the Court below be sustained, on any recognized principle of law? It is a judgment declaring the contracts rescinded; and in the same judgment the Court assess, in damages, the·sum of 2,600 dollars to be paid to the plaintiffs, by the defendant below, for its breach—although plaintiffs never paid any money whatever—and decree the defendant to take back the shreds and fragments of the drill territory. \* \* \* \* \*

As to the rejected evidence generally, all we need further say, is, that inasmuch as the appellees charged the appellant, in their complaint, with fraud and fraudulent representations, and that the invention was inoperative, and entirely worthless, &c.; and as they sought to establish such material allegations by proof of every shade, was it not right and just, and is it not the settled law, to allow the appellant, under such circumstances, to introduce the broadest testimony to the contrary, to rebut the presumptions raised against him?

No man can read the complaint, and the whole record, without being convinced that the rejected evidence, in whatever aspect the case may be viewed, was material, relevant, and admissible; and that it did have a legitimate and inseparable connection with the material facts sought to be established.

This Court, on a former hearing of the cause, were unanimous in the opinion, that the items of rejected evidence went to a material point in the case, and were material, relevant, and admissible, and that the Court below erred in rejecting said testimony. Such being the case, how can this Court now decide the point to the contrary, and say what weight said rejected evidence would have had upon the minds of the jury, had the same been submitted to a jury? Can it be said, such evidence would not have benefitted the appellant, had it been admitted, as this Court, on a former hearing, have unanimously decided it should have been at the hearing in the Court below?

\* \* \* \* \* \* \* \*

The doctrine of the law is, that where fraud is charged as the foundation of a suit, the greatest latitude is observed in the admission of testimony to rebut such charges. This is the general rule. The reason of the rule is sound. The evidence excluded by the Court below was facts, and does not come within the rule of *res inter alios acta.* "It [evidence] is admissible, if it tends to prove the issue, or constitutes a link in the chain of proof; although alone, it

might not justify a verdict in accordance with it. Nor is it necessary that its relevancy should appear at the time when it is offered." 1 Greenl. Ev. § 51, and authorities cited.—*McAllister's* case, 11 Shepl. 139.—*Haughey* v. *Strickler*, 2 Watts and Serg. 411.—*Jones* v. *Vanzandt*, 2 McLean, 596.—*Lake* v. *Munford*, 4 Sm. and Marsh. 312.—*Belden* v. *Lamb*, 17 Conn. R. 441.—*Melhuish* v. *Collier*, 15 Ad. and El. 878, N. S.

If we cannot rebut the presumption of fraud, how can they charge us with it? The excluded evidence was relevant to this issue, and the disputed facts as to the value of the drill as an implement, &c.

"The great and general rule upon the subject seems to be this—that all facts and circumstances, upon which any reasonable presumption or inference can be founded, as 'to the truth or falsity of the issue, or disputed facts, are admissible in evidence." 1 Stark. Ev., part i. § 7.

(2) Mr. *Judah*, for the appellees, submitted the following argument:

Contrary to the determination of this Court heretofore, only to hear an argument on "the points specifically made in the petition, or as to some one or more of them," the counsel for *Gatling* have been pleased to submit a brief of thirty-nine pages, of which twenty-eight pages contain discussions of other points entirely. In our copy of this brief, with the greatest respect both for the wit and the learning of the counsel, we have taken the liberty to stitch up these twenty-eight pages, and we respectfully submit to this Court the propriety of directing the sheriff to perform the same operation on the copies furnished the Court.

We understand that the only question now open, is that stated by this Court on page 584, 9 Ind. R., of the "evidence touching the *Illinois* sales."

It is the law of this state that "the Court must, in every stage of the action, disregard any error or defect in the pleadings or proceedings which does not affect the substantial rights of the adverse party; and no judgment can be reversed or affected by reason of such error or defect." 2 R. S. p. 50, § 101.

The contracts were made in 1850. The action was commenced in 1853. The trial was had in 1856.

The gravamen of the complaint is found in certain alleged false and fraudulent representations. These representations, then, form the substance of the rights of the parties, so far as the evidence is concerned.

Were they made? Were they material? Were they, at the time they were made, or at the time to which they referred, true or false?

That they were made, is found by the Court. But the proof is on the record; and, by way of refreshment, it may be well to refer to the items.

Judge *Peaslee* states four representations—

1. Thirty-two drills had been sold at *Urbana*.

This was false, as appears by *Wilson's* and *Nelson's* testimony.

2. *Mayhew's* contract to manufacture one thousand drills that year at *Chicago*.

There is no pretense of the truth of this.

3. Premiums of 8 dollars per drill in *Ohio*, 10 dollars in *Illinois*.

False. No proof of any in *Illinois*, and only 10 per cent. in *Ohio*.

4. Drills to be obtained at *Chicago*.

Utterly false. No pretense of proof; and to the contrary, see *Evans's* testimony.

The testimony of *James McWorkman* is very full. He states the time of the conversation, *November*, 1850, and we select, as the counsel for *Gatling* says he selected from "our own Reports, at random."

1. Territory in demand.
2. Letters almost daily.
3. One thousand drills manufactured at *Chicago.*
4. Ten dollars premium at *Chicago* on the one thousand drills.
5. Thirty drills already sold at *Urbana.*
6. Ten dollars premium again.
7. Drills to be had at *Chicago.*
8. *Minturn, Allen & Co.* intended to give up all other business.
9. Could not supply the demand in *Ohio* the last season.

In relation to these false statements, in number nine, on their face each material and within the peculiar knowledge of *Gatling*, and each relating to the state of the business in 1850, there is no evidence or even pretense of the truth of any, and the last seven are each contradicted by the testimony of *Mayhew, Nelson, Minturn,* and *Evans.*

It cannot be pretended that this evidence does not make out facts proper to sustain a judgment for rescission, if the other requisites for such judgment are shown to exist. Those other requisites are shown to exist by the case, as heretofore determined.

But it is said that the complaint, in addition to a prayer for rescission, also prays damages as for the breach of an existing contract. But "no judgment shall ever be reversed" for the misjoinder of causes of action. 2 R. S. p. 38, § 52.

By our law, "The Court may, at any time, in its discretion," direct "any material allegation to be inserted, struck out, or modified, to conform the pleadings to the facts proved; when the amendment does not substantially change the claim or defense." 2 R. S. p. 48, § 99.

Hence, we say, that after it appeared by the evidence, that the facts required a claim for rescission, the Circuit Court should have struck out the claim for damages. Such is not only the language of this statute, but it is the undoubted policy of the whole system. And so, again, no judgment can be reversed "for any defect in form, variance, or imperfection," in the pleadings, &c., which might by law be amended in the Court below, "but such defect shall be deemed to be amended in the Supreme Court." 2 R. S. p. 162, § 580.

Hence, if the Circuit Court could or should have struck out the claim for damages, so as to make the complaint conform to the evidence, this Court will deem it so done. But, again, no judgment shall be reversed, if it appear that the merits of the case have been fairly tried in the Court below. 2 R. S. p. 162, § 580.

We refer to this last provision for the purpose of submitting to this Court that, in such case, this Court must examine the record and determine for itself, whether the merits have been fairly tried.

It has been ruled by this Court, that a party cannot complain of the rejection of testimony, "unless the record show that he was injured." *Lett* v. *Horner*, 5 Blackf. 296. We translate this to mean, that this Court must be satisfied, by the record, that the party was injured.

Hence, the question in such case is for this Court, not whether the rejected evidence might have changed the result, but first, whether, according to the

law of the land, if admitted, it should change the result. If this Court determine that such should be the result, then will come the second question, but for the jury, and not for this Court, under any circumstances—Shall it change the result? Respectfully we object to the language of the Court, in the statement of the question. 9 Ind. R. 584. It is sufficient to reverse the case, "unless we can say that that evidence if admitted, would not have changed the result."

The Court have not examined, as we read the case, the previous question—Should that evidence, if admitted according to law, change the result. In other words, does it touch the merits of the case? What are the merits? They are found in nine several distinct, false and fraudulent representations. These are sufficient to sustain the judgment. With neither of them have the rejected evidence any, the least, connection.

But there was a tenth representation in evidence, that the improvement was valuable. Valuable in 1850? The rejected evidence tended to show some value in 1856. Possibly its admission would not have been error. Possibly, if admitted, it might, not should, have had some weight as to the determination of the jury on this tenth representation. But how could or would it, or rather how should it, affect the determination upon the other nine facts with which it had no connection, and which of themselves are sufficient to sustain the judgment?

We have referred to the various statutes above for the purpose of showing the policy of our law, and so, the reasonableness of our position, that whether the rejection of evidence was proper or not, the judgment cannot be reversed.

We wish to submit a few remarks as to the evidence itself. We deny that this evidence was admissible. It was as to a fact which occurred six years after the contract was made, three years after the suit was instituted, and between strangers. It no more went to show value in 1850, in the patent, than the admitted facts, that *Beach* bought and paid for it in 1850; or that eighteen or twenty drills were sold at *Urbana* in 1851 and 1852. It only went to show that as *Beach* was found to be gulled in 1850, and the eighteen *Ohio* men were found to be gulled in 1851 and 1852; a man was found in *Illinois* to be gulled in 1856. *Beach* repudiates. The *Ohio* purchasers returned their drills; and for all that appears, the *Illinois* purchaser would do the same at the proper time, unless, indeed, the whole thing was collusive. And we refer to 1 Stark. Ev. pp. 58, 59; 8 Cush. 600; 17 Ohio R. 16; 2 Greenl. Ev. § 494.

Messrs. *Willson, McDonald,* and *O'Neal,* submitted the following argument:

Under the rulings of the Court, this cause is re-submitted upon the exceptions taken to the rulings of the Circuit Court, as contained in the fourth and fifth bills of exceptions. These exceptions show that during the progress of the trial, the appellant offered to prove by a witness by the name of *Hart,* that recently he, *Hart,* had sold, as agent for *Royal Mayhew,* territorial rights in the state of *Illinois* for a large sum of money, and that there was, at that time, a great demand for the drill in the state of *Illinois;* and the appellant also offered to prove generally, by said *Hart,* that sales for territorial rights, had been made in the state of *Illinois,* and what demand existed there for the drills. The Court, on the objection of the appellees, refused to hear said evidence, but permitted the appellant to prove what sales, if any, had been made, of terri-

torial rights in the state of *Illinois,* and what demand existed there for the drill up to the time of the making of the contracts in controversy in the suit, and for and during the ensuing season.

These rulings, by proper bills of exceptions, are brought before the Supreme Court, to test their correctness.

It is claimed that the evidence was pertinent to the issues, and legitimate, as tending to prove that the territorial rights sold by appellant to the appellees, were of some value; and it is further claimed that in determining the question of the rescission of the contracts between the parties, the value of those rights, was a matter material for the consideration of the Court. We controvert both of these propositions, and shall discuss them in the reverse order in which they are here stated.

We contend that the question of value of the rights, did not legitimately enter into the question of rescission.

If the *Circuit Court* had determined that the contract could not be rescinded, but that the appellees were entitled to damages, on account of the fraud perpetrated, then the question of the value of the rights would have been material, in order to grant the proper measure of relief. But to entitle the appellees to rescission, it was not necessary to allege that the rights were of no value; and the allegation was only intended to enable the appellees to fix their measure of damages in the event that the relief by rescission should be denied them; and inasmuch as rescission was the main object of the complaint, and the principal relief sought, other and minor questions of relief could not be deemed material, until this had been overruled. At all events, this Court cannot reverse this case on account of the rejection of evidence, which could only be material in the event that a different relief had been granted by the Circuit Court.

It is laid down as a general proposition in cases of this kind (and we admit its correctness), that the application to a Court for the rescission of a contract, is addressed to the sound discretion of the Court, under all the circumstances of the case. That is, all the circumstances that enter into the questions upon which the right of rescission depends, and these questions, in our opinion, are two—

*First.* Fraud in the contract, such as would vitiate and render it void.

*Second.* That the party defrauded, had, with legal diligence tendered a rescission, by offering back what he had received, and demanding what he had given on the contract.

If these two points are sufficiently established we conceive that the defrauded party is as much entitled to this kind of relief, as he would be to have judgment on a promissory note, where no successful defense had been made. Nor is he bound to keep a specific article, that had been put upon him by a fraud, because it may be said to be valuable or equal in value to the price paid.

If, for instance, *A.* should purchase of *B.* a dwelling, under representations from *B.* falsely and fraudulently made, that it was well situated, and free from noise and disturbance, and upon taking his family to it, should find it surrounded by shops and stores, and subject to constant din, and wholly unfit for a residence, and should, with proper diligence, tender a rescission, could *B.* defeat his right to rescind by setting up that the property was worth more than *A.* had given for it? We think not. But if *A.* should fail to obtain a rescission of the contract, then the question of value would be material. But in reviewing a decree for the rescission of the contract, would this Court reverse

it, because the Circuit Court had not listened to the evidence of value, which could only be material, if the particular relief granted had been denied by the Circuit Court.

But even if the question of value was involved in determining the right to rescind, we are quite clear that the evidence was correctly rejected.

*First.* It falls within that class of evidence which is denominated *res inter alios acta*, in reference to which the following rule is laid down by *Starkie:* "Great latitude is justly allowed by the law in the reception of indirect or circumstantial evidence, the aid of which is constantly required, not merely for the purpose of remedying the want of direct evidence, but of supplying an invaluable protection against imposition. The law interferes to exclude all evidence which falls within the description of *res inter alios acta.* The effect of which is, to prevent a litigant party from being concluded or even affected by the evidence, acts, conduct, or declarations of strangers." 1 Stark. Ev. p. 58. Again, on page 59, in giving the reason of the rule—"For it may have been made, not because the fact admitted was true, but from motives, and under circumstances, entirely collateral, or even collusively, and for the very purpose of being offered as evidence." This rule is adhered to by all elementary writers on the law of evidence, and is so just that it cannot safely be departed from; and we think it wholly excludes the testimony offered. It was clearly the result of acts of strangers, and that, too, long after the contracts involved in this case had been made, and while the litigation was in progress to determine them. It was obnoxious all over to the suspicion of collusion. The Circuit Court judged it with all the lights before that Court, and rejected it. We think this Court cannot reverse that decision on that ground.

In the second place, the circumstances offered to be proved had no legitimate connection with the facts sought to be established. The appellees had alleged that the property sold to them was of no value. That is, that the right to make and vend the appellant's grain drill in certain specified territory, in the states of *Ohio* and *Michigan* and *Minnesota*, was of no value. And it is attempted to prove what the right in these territories is worth, by showing the demand for the drill in the state of *Illinois*, and sales made of the right in the last-named state; and this, too, five years after the purchase made by *Newell* and *Beach.* This appears to us too far-fetched; it is like proving the value of real estate in *Indiana*, by showing what real estate is worth in *Illinois.* But it may be contended that the general topography of the country is known to the Court, and that there is no such dissimilarity between the two sections of the country, but that an implement of this kind must have some value in the one, if it sells readily in the other, and that this establishes a sufficient connection to make the testimony pertinent and legitimate. We do not see the correctness of the analogy. Mere adaptation of soil is not the only thing necessary to give demand and value to such a right. Popular favor is the most important element in creating such value, and the Court cannot judicially know anything about the relative situation of the two sections in this particular.

The Court has as much knowledge judicially of the topography of *Texas* as of *Illinois*, and may be as well assured of the adaptation of the soil in this first-named state to the use of the drill as of the adaptation of that of *Illinois;* and yet we do not think the Court would hesitate to reject evidence of sales and demand in the state of *Texas.* If it was competent for the appellant to prove value by such evidence, then it would have been competent for the ap-

pellees to rebut it by the same kind of evidence. That is, to prove that in other states and territories, the right had no value, and that there was no demand. But this is so completely outside of the issue, that a mere statement of it is sufficient to repel it.

But again, we do not think that offers to buy, or offers to sell, or sales themselves, even if limited to the territory in question, would be proper evidence to determine the value. Such have been the rulings in regard to other kinds of property, and we do not see why it is not applicable to this. See 8 Cush. 600; 17 Ohio R. 16. And it is on the ground that such testimony is liable to collusion and fraud. In 17 Ohio R. 16, the Court holds the following specific language:

"The Court permitted proof of the amount for which the property of *Myers* sold under the assignment, to prove the value of the property of *Myers* at the date of the declaration in the letter complained of. This is wrong. The true question is, what was the value of the property; not, what did it sell for. Property often sells for less than its value, and almost certainly so, at forced sales. What the property sold for under such circumstances, would not be evidence to prove its value at a fair time."

It is insisted, however, that a distinction exists in regard to this species of property, and Curtis on Patents, p. 469, and 2 Greenl. Ev. § 494, are cited to show that distinction. Both of these authors are discussing the question of utility, as affecting the right of the patentee to claim a special property in the thing patented.

To entitle him to maintain his claim, he must show his invention to be both new and useful. As to the question of novelty, the letters patent are *prima facie* evidence, but he must give some evidence of the utility. This may be done, say the authors, by the testimony of persons well conversant with the subject, that the public had given large orders for the article, or that licenses had been taken for the exercise of the right. That is, the utility of the implement patented, may be so shown; and this authority can only apply where the right of the patentee to the thing patented, or to property in it, is in controversy. That is not the case in this suit. It is not questioned that the appellant was the patentee. Indeed, it is so averred in the complaint. Nor is it urged that he had no property in it, but that the territory he had sold to the appellees, was of no value. But then, again, these authorities, if they applied to proof of value (which they do not), fall short of establishing the points; for they do not state that when the question of value as to a particular territory is involved, you may show orders or licences in another, to prove that value. It is only when the question involved is utility, or utility in general, that the evidence is applicable for the purpose of proving utility. But even then, it does not prove any value. The proof of utility is inferential only from the evidence. But can you go further, and draw an inference from an inference? As, for example, from the fact that licenses have been taken out for the exercise of the right, and orders given by the public, the jury may infer that the implement patented is of utility, and having drawn that inference from the evidence, may they further infer from its utility, that it is of some value, and further, because it is of utility in *Illinois*, it is of utility in *Ohio* or *Michigan;* and because they have inferred from the demand in *Illinois* that it is of utility there, and of some value, they might also infer that it was of utility and value in *Ohio* and *Michigan?* Surely, this is extending the doctrine of inferential and presumptive